648 F.2d 925
 25 Fair Empl.Prac.Cas. 953,
25 Empl. Prac. Dec. P 31,792
William A. TALBERT, Appellee,
v.
CITY OF RICHMOND; Jack M. Fulton, individually and in his
official capacity as Director of Public Safety of
the City of Richmond, Appellants,
and
Manuel Deese, in his official capacity as City Manager of
the City of Richmond; Theodore E. Thornton, individually as
Former Director of Personnel of the City of Richmond; Beryl
Carter, in her official capacity as Acting Director of the
Personnel of the City of Richmond, Defendants.
 No. 80-1273.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 12, 1980.
Decided May 1, 1981.
 
 James R. Saul, Asst. City Atty., Richmond, Va. (Conard B. Mattox, Jr., City Atty., Richmond, Va., on brief), for appellants.
 Michael S. Shelton, Richmond, Va. (Cohen, Abeloff & Staples, P. C., Richmond, Va., on brief), for appellee.
 Before BUTZNER, Circuit Judge, FIELD, Senior Circuit Judge, and HALL, Circuit Judge.
 BUTZNER, Circuit Judge:
 
 
 1
 The City of Richmond, Virginia, and Jack M. Fulton, its Director of Public Safety, appeal from a judgment of the district court that awarded damages and injunctive relief to William A. Talbert, a white police officer, on his complaint that the city and its officials denied him promotion on the basis of his race. Talbert predicates his claim on 42 U.S.C. §§ 1983, 1985(3), 1986, and 1988, the fourteenth amendment, and appropriate jurisdictional statutes. He does not rely on Title VII of the Civil Rights Act of 1964, as amended. We reverse because we believe the district court did not apply a proper legal standard in determining whether the city violated the equal protection clause of the fourteenth amendment.
 
 
 2
 * Talbert claims that the city denied him equal protection of the law when it failed in 1978 to promote him from the rank of captain to major. The city had posted a notice announcing three vacancies in this rank. The city charter establishes a "rule of five" as the initial procedure for making promotions. The appointing authority, in this case the Director of Public Safety, is required to consider for promotion a number of candidates equal to the number of vacancies plus five. Therefore, the eligibility list for the three vacancies contained eight names. Candidates were certified to the eligibility list as a result of testing conducted at the city's personnel assessment center.
 
 
 3
 When the Chief received the certified eligibility list from the personnel department, the eight candidates were listed in the order of their performance at the assessment center. Talbert was listed number three, with an assessment center score of 39.5. In a letter to the Director, the Chief recommended for promotion the first two candidates on the list. He then skipped over Talbert and several other white candidates and recommended candidate number eight, Laurel M. Miller, a black police captain whose test score was 34.0.
 
 
 4
 The letter commented on each candidate. Regarding Talbert the letter stated:
 
 
 5
 A very capable and efficient officer. A take-charge type individual who can be relied upon to get the job done especially in the field. There is no doubt in my mind that he could function effectively as a Police Major and there would be no hesitancy in recommending his promotion if there is a future vacancy.
 
 Regarding Miller the Chief wrote:
 
 6
 A very steady, easy going individual who performs his assignments without fanfare. He has established a reputation for honesty, fairness and impartiality. His permanent assignment as Captain is Deputy-Inspector, but since June 4, (1977), he has been Acting Major-Inspector of Police. If you approve his promotion, it is my intention to make this his permanent assignment. For the record, I believe that this additional comment is necessary.
 
 
 7
 Captain Miller is the first Black who has ever been in contention for promotion to Major. He has reached this plateau on his own merit. In a City with a population which is approximately 50% Black, I feel it would be to the City's advantage to have a man of his caliber and reputation in a top level policy making position.
 
 
 8
 I do not feel that the point difference between positions 3-4-5-6 and 8 is so great that we should side step this opportunity to promote a deserving individual and at the same time to comply with the spirit and intent of the City's Affirmative Action Plan.[1]
 
 
 9
 The Director accepted the Chief's recommendation and promoted Miller.
 
 
 10
 Talbert claims that in view of his superior test score, the officials' consideration of Miller's race establishes that the promotion was made unconstitutionally. The district court ruled in favor of Talbert. It found: Miller and Talbert had substantially similar backgrounds and records in the police department; the Chief's description of Talbert was "much more glowing" than his description of Miller; there was a 5.5 difference in the candidates' test scores; this difference was predictive of better performance by Talbert; and although this predictive function of the test scores was never explained to either the Chief or the Director, they both recognized that a high score was better than a lower score.
 
 
 11
 The court did not evaluate the relative merits of Miller and Talbert, and it made no finding that one was better qualified than the other. Nor did it discuss the significance the Chief and the Director placed on the fact that Miller had been discharging the duties of a major in his capacity as Acting Inspector. Instead, the court emphasized the difference between Miller's and Talbert's assessment center scores. Referring to this difference, it drew the inference that the Chief's sole reason for recommending Miller was his race. With respect to this reason, the court found:
 
 
 12
 Now, his reasons for doing that are in most respects laudatory. His reason for doing it is because he thought it was best for the police force; he thought it was best for the City; he thought that it would help the City in its relations with the people that the police force is required to maintain order among, and to enforce the law. He thought it would be good for the spirit and morale of the citizens. I'm certain all of those things entered into (the Chief's) and (the Director's) determination to make this promotion on the basis of race.
 
 
 13
 The district court ruled that consideration of Miller's race was impermissible. It held that the city and its officers had violated Talbert's constitutional right to be free of discrimination on the basis of race, and it awarded him damages, injunctive relief, costs, and attorney's fees.
 
 II
 
 14
 The city urges that it should prevail because its action was consistent with the principles of Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Miller's race, it argues, was simply a plus factor which could be considered along with his undisputed qualifications. Talbert contends that Bakke is inapposite because the city had no affirmative action program, and it never conceded past discrimination. The district court agreed with Talbert. It concluded that in the absence of an affirmative action program, Bakke prohibited any consideration of race.
 
 
 15
 Bakke dealt with a state school's special admissions program described in these terms: "To the extent that there existed a pool of at least minimally qualified minority applicants to fill the 16 (minority) special admissions seats, white applicants could compete only for 84 seats in the entering class, rather than the 100 open to minority applicants." 438 U.S. at 289, 98 S.Ct. at 2747. For various reasons a majority of the Court coalesced to hold that the admissions program was unlawful, that a white applicant barred by operation of the program was entitled to admission, but that it was error to enjoin the school from according any consideration to race in its admission program. 438 U.S. at 271-72 and 320, 98 S.Ct. at 2738 and 2763.
 
 
 16
 Here, unlike Bakke, the city had no affirmative action program that set quotas or numerical goals for the promotion of minority police officers. Unlike Bakke there were no vacancies allotted exclusively to black officers from which white candidates for appointment were barred. Black and white officers competed for the same vacancies. Also, unlike Bakke, there is no suggestion that the city officials were motivated in making appointments by a desire to rectify past discrimination. Indeed, the city does not concede that it ever discriminated against its black employees.
 
 
 17
 Bakke, though not dispositive, is instructive. A majority of the Court, for different reasons, held that even if a state institution is not under an authoritative mandate to operate according to a formal affirmative action program, it is not absolutely barred from giving any consideration to race. 438 U.S. at 320 and 326, 98 S.Ct. at 2763 and 2766. Justice Powell found justification for the Court's decision on this point in a state school's interest in obtaining a diverse student body. 438 U.S. at 311-15, 98 S.Ct. at 2759-2761. Justice Brennan, Justice White, Justice Marshall, and Justice Blackmun justified the decision by the school's interest in rectifying past discrimination. 438 U.S. at 362-69, 98 S.Ct. at 2784-2788.
 
 
 18
 The city claims that it took race into account to advance the operational needs of the police department by achieving diversity among the officers ranked as major. It viewed such diversity as important to effective law enforcement in a city whose population was approximately 50% black. The city does not claim that it promoted Miller as a remedy for past discrimination in the department. Accordingly, we will follow Justice Powell's analysis in this case, because the city's claim that diversity is beneficial to operation of the department is akin to the claim accepted by Justice Powell in Bakke that a school has a legitimate interest in obtaining a diverse student population.
 
 
 19
 Justice Powell explained in Bakke that there is no facial intent to discriminate "in an admissions program where race or ethnic background is simply one element to be weighed fairly against other elements in the selection process." 438 U.S. at 318, 98 S.Ct. at 2762-2763. Whether such an individualized consideration of race would pass constitutional muster, Justice Powell suggests, should be determined by application of the principles expounded in Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). 438 U.S. at 318-19, 98 S.Ct. at 2762-2763. These cases prescribe criteria for determining whether a state's asserted reason for its action is a cloak for invidious discrimination that violates the equal protection clause. 438 U.S. at 318-19, 98 S.Ct. at 2762-2763. Accordingly, we will apply the principles of these cases to the facts disclosed by this record.
 
 III
 
 20
 Washington v. Davis establishes that Talbert must prove that the city officials acted with a racially discriminatory intent or purpose when they promoted a black officer instead of him. This appointment obviously had an adverse impact on Talbert. But the impact of the officials' act, though relevant, is not sufficient to establish a violation of the fourteenth amendment. 426 U.S. at 239, 96 S.Ct. at 2047. In Arlington Heights the Court reiterated this cardinal principle: "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 265, 97 S.Ct. at 563.
 
 
 21
 Arlington Heights prescribes the following criteria for "determining whether invidious discriminatory purpose was a motivating factor" for the government's act: first, the impact of the act that is, whether it burdens one race more than another; second, the historical background of the challenged decision; third, the degree to which the action departs from either normal procedural sequence or normal substantive criteria; and, finally, the contemporaneous statements of those making the decisions. 429 U.S. at 266-68, 97 S.Ct. at 564-565. This summary, though not exhaustive, identifies the "subjects of proper inquiry in determining whether racially discriminatory intent existed." 429 U.S. at 268, 97 S.Ct. at 565.
 
 
 22
 In this case the appointment of a single black major results in no disproportionate impact on the white race. Along with Miller, two white officers were appointed. Subsequently, only white officers, including Talbert, have been promoted to the rank of major. Undoubtedly, the decision to take Miller's race into account had an adverse impact on Talbert. But "impact alone is not determinative, and the Court must look to other evidence." 429 U.S. at 266, 97 S.Ct. at 564.
 
 
 23
 The record discloses the historical background of the decision to appoint the first black officer to a high position in the police department. The Chief acknowledged that there was a time, within his service in the department, when it was considered important for the city "that there be no black police officers." This case was tried in the wake of another recent suit entitled Richmond Black Police Officers' Ass'n v. City of Richmond, 74-0267-R (E.D.Va., July 3, 1975), which was terminated by a consent decree reciting in part:
 
 
 24
 The City of Richmond also denies that it has engaged in such racially discriminatory acts or practices, or pattern or practice, relating to employees of the Richmond Bureau of Police since the effective date of the 1972 Amendments to 42 U.S.C. § 2000e et seq. But while denying liability to the named plaintiffs and the plaintiff class, the defendants realize that certain past practices within the Bureau may have given rise to an inference of discrimination against black persons. The individual defendants and the City have made good faith efforts to rectify and prevent racial discrimination in employment in the Richmond Bureau of Police and since June 11, 1974, the percentage of black employees has substantially increased. The defendants state that for the purpose of avoiding any further inference of discrimination, the City of Richmond has heretofore taken certain steps to eliminate policies, practices and procedures which were possibly discriminatory or potentially discriminatory against black persons.
 
 
 25
 The decree provided that the city officials "shall not engage in any act or practice which has the purpose or effect of unlawfully discriminating against any employee because of such individual's race." The decree also stipulated that it was to be construed and implemented in a manner consistent with the thirteenth and fourteenth amendments and the Civil Rights Acts. Thus it appears that although the consent decree did not commit the city to a program of affirmative action involving quotas or numerical goals, it did require faithful adherence to constitutional principles.
 
 
 26
 For the purpose of detecting an intent to invidiously discriminate, the historical background disclosed by this record is important in two respects. First, it establishes that the city has not historically discriminated against white police officers. Second, it reveals that although the department has long been dominated by white personnel, the city has now undertaken to remove barriers to the promotion of qualified black officers.
 
 
 27
 The third inquiry identified by Arlington Heights is the degree to which the action departs from either normal procedural sequence or normal substantive criteria. Talbert contends that the superiority of his test score establishes his entitlement to promotion under normal circumstances. He emphasizes that the only occasions when promotions had not been made according to test rank involved scores differing by only a fraction of a point.
 
 
 28
 We perceive no significant procedural departures. The "rule of five" set out in the city's charter was followed scrupulously. Under this rule the number of persons certified must equal the number of vacancies plus five. The evidence discloses that the test was designed to establish access to the eligibility list. The Director, the Chief, and the consultant who devised the test recognized this limited function of the test scores.[2] Neither the Chief nor the Director had been instructed about any predictive function of the scores. Furthermore, the uncontradicted evidence establishes that the Director has never considered himself bound to promote according to ranking of test scores, and on other occasions he has made promotions out of order. Thus it is apparent that the test was not designed to govern the ultimate appointment. Moreover, if the test scores were used to determine promotion as well as certification, the "rule of five" would be thwarted, for the candidates with the five lowest scores would be barred from promotion.
 
 
 29
 Also, the record discloses no significant departure from the substantive criteria normally employed by the Chief and the Director. Miller's score qualified him for promotion. Previously the city had promoted a white officer to major whose score had been lower than Miller's. Other white officers whose scores were not significantly higher had been appointed to this rank. Although the Chief had never previously recommended for promotion a candidate whose score was more than a point lower than that of a competitor, both officials considered the differences between Miller's and Talbert's scores and concluded that Miller's promotion was nevertheless warranted.
 
 
 30
 Miller's assignment as captain was Deputy-Inspector. When the Inspector resigned, Miller was named an acting major, and in this capacity he served as Acting Inspector for more than a year. His ability to discharge the duties of this office was one of the reasons that the Chief recommended his promotion to the rank of major despite the differences in the candidates' scores. In contrast, Talbert had not served as an acting major, and the Chief's letter indicated that his strength lay in getting the job done in the field. That such factors were normally considered by the Chief in making promotions is shown by his entire letter of recommendation, which discussed the experience and performance of each of the eight candidates.
 
 
 31
 The final inquiry prescribed in Arlington Heights concerns the administrative history of the action and especially the contemporary statements of the officials who made the decisions. The principal statements of this nature are in the Chief's written recommendation of Miller.[3] His letter reveals: (1) the Chief considered both Miller and Talbert to be qualified for promotion; (2) Miller had already been performing as an acting major in his capacity as Inspector and the Chief thought it desirable to make this assignment permanent; (3) the Chief recognized Miller's personnel assessment center score was lower than Talbert's; (4) the Chief did not view this differential as disqualifying Miller from promotion; and (5) appointing for the first time a qualified black officer to a top level policy-making position would benefit a city whose population was approximately 50% black. The testimony of both the Chief and the Director reaffirmed these contemporary statements.
 
 
 32
 The evidence discloses that the officials' reason for taking Miller's race into account was their belief that his appointment would be an advantage to the city. As shown by the extract from the district court's opinion quoted in Part I, the court credited this articulation of the officials' motive for promoting, for the first time in the history of the city, a black officer to the rank of major. The reason they expressed was not a pretext to cloak invidious discrimination against Talbert.
 
 
 33
 Application of the criteria prescribed by Arlington Heights to the facts disclosed by this record establishes that invidious discriminatory purpose was not a motivating factor in the decision to promote Miller. Like the prosecutor in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the city officials legitimately took race into account, on an individualized basis, to achieve a legitimate end. Cf. Bakke, 438 U.S. 319 n.53, 98 S.Ct. 2763 n.53. It was not unlawful for them, as the officials responsible for the operation of the police department, to consider Miller's race in order to have both white and black officers in the department's upper ranks. In Detroit Police Officers' Ass'n v. Young, 608 F.2d 671, 695-96 (6th Cir. 1979), Judge Lively addressed this aspect of the operational needs of an urban police department serving a multi-racial population. After canvassing studies and expert opinion concerning this subject, Judge Lively thoughtfully concluded:
 
 
 34
 The argument that police need more minority officers is not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather, it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police. In short, the focus is not on the superior performance of minority officers, but on the public's perception of law enforcement officials and institutions.
 
 
 35
 In summary, the attainment of racial diversity in the top ranks of the police department was a legitimate interest of the city. This interest justified the officials' individualized consideration of Miller's race together with all other relevant factors. Their action was not a pretext to cloak invidious discrimination against Talbert. In the words of Arlington Heights, Talbert has "failed to carry (his) burden of proving that discriminatory purpose was a motivating factor (in the city's act.) This conclusion ends the constitutional inquiry." 429 U.S. at 270-71, 97 S.Ct. at 566.
 
 
 36
 The judgment of the district court is reversed, and the case is remanded for entry of judgment for the appellants.
 
 
 37
 REVERSED AND REMANDED.
 
 
 
 [1]
 Two candidates were listed at the number six spot on the eligibility list since they had received identical scores from the personnel assessment center. Therefore no candidate was listed as number seven. Also, the Chief testified that in referring to the "City's Affirmative Action Plan" he meant the "City's Equal Opportunity Plan;" the city had no affirmative action plan
 
 
 [2]
 The consultant testified that "the original task which we were given by the City of Richmond was to develop a procedure which would qualify individuals for an eligible list," and that although the test could be used to differentiate among candidates "to some degree," this was not its major purpose. He indicated his understanding that the assessment center score was not used by the city as the sole basis for making promotions, and he stated that his company would never advise clients to rely strictly on the test instead of also considering their own perceptions and observations as to an employee's ability
 
 
 [3]
 See text at n.1, supra