**SHAW, Barbara Sucha, Plaintiff,**

**v.**

**STATE OF NEBRASKA, DEPARTMENT OF CORRECTIONAL SERVICES, an Agency of the State of Nebraska, Hendrickson, Brian, Individually and in his capacity as The Administrator of the Department of Correctional Services Post Care Program, and Avery, David S., Individually and in his capacity as Lincoln Post Care Center Manager, Defendants.**

**No. CV86–L–331.**

United States District Court,
D. Nebraska.

Aug. 4, 1987.

Thom K. Cope, Lincoln, Neb., Judy K. Hoffman, Omaha, Neb., for plaintiff.

Charles E. Lowe, Asst. Atty. Gen., Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, District Judge.

The plaintiff, Barbara Sucha Shaw, alleges that the Nebraska Department of Correctional Services (the Department) and two of its administrators, Brian Hendrickson and David Avery, violated Title VII by denying her a promotion for which she was qualified because she is female. She seeks back pay, promotion, and, until a position becomes available, front pay. Shaw also contends that Hendrickson and Avery violated her fourteenth amendment equal protection rights, and seeks general and punitive damages from them in their individual capacities.[1]

In a previous state administrative proceeding, the Nebraska Equal Opportunity Commission (NEOC) adopted the findings and recommended order of the hearing examiner, who held that Shaw failed to prove that the defendants' legitimate, nondiscriminatory reason for the promotion of a male applicant, Jerry Fischer, was pretextual. *See* exhibit 101. The Equal Employment Opportunity Commission issued Shaw a notice of right to sue on January 30, 1986. *See* exhibit 1. A trial was held without a jury on April 3, 1987, with the evidence consisting primarily of the full record of the March 1985 NEOC hearing.

## I. TITLE VII

Title VII requires "equality of employment opportunities...." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). The parties have stipulated that Shaw has shown the elements of a prima facie Title VII case. She is female, she was qualified for the position she sought promotion to, she was not promoted, and a white male

was promoted. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575, 98 S.Ct. 2943, 2948, 57 L.Ed.2d 957 (1978); *Bell v. Bolger*, 708 F.2d 1312, 1316 (8th Cir.1983).

With the prima facie case established, the burden of production shifts to the defendants to present "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason," which they have done. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Thus, the question to resolve concerning Shaw's Title VII claim is whether she has proved by a preponderance of the evidence that "the presumptively valid reasons for [her] rejection were in fact a coverup for a ... discriminatory decision." *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1825.

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Shaw may prove that the defendants' reasons for the promotion decision were pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. She is not required "to submit direct evidence of discriminatory intent." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983).

## II. BACKGROUND

The position of assistant center manager for programming at the Lincoln Post Care Center (the Center), operated by the Department, became available in October, 1983. Shaw, then a correctional counselor at the Center, and Fischer, who ran the

---

**1.** The complaint purports to sue the Department under § 1983, a claim barred by the eleventh amendment. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98–100, 104 S.Ct. 900, 906–907, 79 L.Ed.2d 67 (1984); *Quern v. Jordan*, 440 U.S. 332, 341, 345, 99 S.Ct. 1139, 1147, 59 L.Ed.2d 358 (1979). It also appears to seek

damages from the individual defendants in their official capacities, an effort that also runs into the eleventh amendment bar. *Quern*, 440 U.S. at 337, 99 S.Ct. at 1143. In her post-trial brief, Shaw limits her arguments for § 1983 damages to Avery and Hendrickson in their individual capacities.

chemical dependency program (CPD) at the center, were among six Department employees who sought promotion to the position. The vacancy occurred when Jim McKenzie, Shaw's supervisor at the time and the first person to hold the assistant center manager position, resigned to take another job within the Department. McKenzie had been a correctional counselor prior to assuming the assistant center manager position in 1981. Avery, the manager of the Center since 1978, was McKenzie's supervisor, and reported to Hendrickson, the assistant director of corrections for community services.

Until late 1981 there were two Lincoln Post Care Centers, one for men and one for women, with sex-segregated staffs. The two were merged by early 1982, but the job duties of the male and female staff differed somewhat until 1983. At the time of the NEOC hearing, only approximately one-third of the Center staff was female, and no women held administrative positions.

In the fall of 1980 the Department sought accreditation from the American Correctional Association; equal employment opportunity compliance was a factor in accreditation. Avery hired a female correctional counselor that fall. She left the employ of the Department within two weeks, and Shaw was hired to fill the vacancy beginning October 1980. Shaw's undergraduate degree is in criminal justice, and she has been a correctional counselor since she began working for the Department.

McKenzie became the supervisor over the correctional counselors in June 1981, and, through what apparently was an informal process, became the assistant center manager. His office is across from Shaw's. McKenzie and Avery testified that Shaw did not think of McKenzie as her supervisor. McKenzie said that Shaw told him that she "had difficulty over the way that I had come into the supervisory position and that she ... did not think of me as her supervisor...." NEOC transcript at 66. To illustrate this Avery testified that Shaw took her vacation request sheet to Avery rather than to McKenzie. Shaw testified that she didn't have trouble accepting McKenzie as her supervisor, but that she felt that he and Avery did not respect her.

Fischer, who holds an undergraduate degree in psychology and had four graduate credits in counseling, began working with the chemical dependency program at the Center in 1979. CDP was a separate unit within the Department, and Fischer reported to Dr. Mariam Haworth, administrator of the chemical dependency program, rather than to McKenzie. Haworth, who testified that Fischer was a good employee with initiative, said she visits the Center about two hours per week, while Avery said she visited as infrequently as four times a year.

Shaw's annual performance reports, rated on a zero (low) to four (high) scale, averaged 2.77 for 1980–81, 3.3 for 1981–82, and 3.1 for 1982–83. In the last evaluation McKenzie noted that Shaw needed to close files faster and devote more energy to helping "less capable offenders seek employment...." Exhibit 2 at the NEOC hearing. The defendants assert that Shaw's performance declined between May and September 1983, after her last evaluation, but there is no documentation to that effect nor was she told that there were problems with her performance. McKenzie testified that Shaw really did not improve her performance between the first and second performance reports, even though the evaluations suggest that she did, and that he did not like to criticize employees in the evaluations. He sees them as a "morale-boosting tool."

Fischer's performance reports averaged 2.77 for 1980–81, 1.77 for 1981–82 (a year during which he was having "problems" that later were resolved), and 2.6 for 1982–83. Dr. Haworth testified that she is a hard evaluator, so the scores she assigned reflect good performance by Fischer. In the 1982–83 report Haworth noted that Fischer should handle discharges faster, submit reports on a more timely basis, and improve the accuracy of client files. Exhibit 4 at the NEOC hearing. She testified that Fischer's performance improved dur-

ing the period May through September 1983.

Shaw and other correctional counselors work toward the "overall preparation of offenders ... for their ultimate release ...," according to McKenzie. NEOC hearing transcript at 41. The job description requires "[k]nowledge of programs and opportunities open to legal offenders." Exhibit 1 at NEOC hearing. "The counselor is exposed to all facets of correctional counseling and casework." Id. Chemical dependency counselors represent a specialized "part of a program for both training and productive work," and provide "counseling and therapy to chemical dependent residents...." Exhibit 3 at NEOC hearing. The job requires knowledge and skills related to counseling and chemical dependency. Id.

The assistant center manager is responsible for supervision of correctional counselors and for staff development. Exhibit 10 at NEOC hearing. Suggested job preparation guidelines include: "Post high school coursework/training in: Criminal Justice or Human Services fields and experience in community based corrections." Id. Fischer testified that no more than 10% of his time in the assistant manager position involves counseling.

Avery testified that it would take a case manager two to four weeks to learn the job, but any one else (of average intelligence) would need four to six months. NEOC hearing transcript at 166, 208. Several witnesses testified that Avery said it would take him six months to train Fischer.

Testimony regarding the working environment at the Center reveals an inequitable, nonprofessional attitude toward women on the part of Avery and Hendrickson. Avery refers to female employees as "girls," and Hendrickson has addressed them as "dear" and "honey." Avery asked Crystal Peterson, a corrections officer, why she did not get married. Hendrickson asked Bertha Wicker, a case manager, why she did not marry and settle down. When she complained to Hendrickson of harassment by coworkers she did not notice that he took any action to correct the abuse.

Avery made remarks to women about their bodies, such as "It's getting a little wide in the back, isn't it?" and commented to women about the snacks they ate, calling them "fat pills." He suggested to Shaw that she get married and let her husband take care of her.

Avery made comments to Teresa Mulkey, a correctional counselor, to the effect that after she had her baby she probably would not return to work "due to maternal instinct." NEOC hearing transcript at 383. Concerning a tour of the facility that Mulkey gave to outside visitors, Mulkey said that Hendrickson "made the comment to the effect that we were real progressive because they had a pregnant woman giving the tour. He attempted to pat my stomach...." Id. at 382. Female employees testified that their ideas were not taken seriously, that assertiveness in women was viewed negatively, and that women were assigned clerical duties not assigned to men.

The selection committee for the assistant manager position included Hendrickson, Avery, and Gene Hruza, the education coordinator for the Department. Avery and Fischer had developed a close personal relationship at work. Avery talked to Fischer about Avery's personal problems and Fischer often offered advice about how he was doing in the work setting. Prior to the job interviews Avery reviewed the job applications and resumes. Hruza did not see the applications, employee files, or the center manager job description prior to the interviews. According to a letter from the Department's personnel director to the NEOC:

> The sources of input considered by the selection committee were primarily the applications of the interviewee[s]. However, at least two members of the committee were either supervisors of most of the interviewees, had talked to the supervisors of the interviewees or were keenly aware of the work history of the interviewees.

Exhibit 20 at the NEOC hearing.

Fischer's interview lasted approximately thirty minutes; Shaw's as few as five.

Hendrickson said her interview was shorter because he already was familiar with her, yet he also said that the interviews mattered because he did not know before the interview who he'd recommend. The committee did not have a uniform list of interview questions to pose to the candidates. Each committee member completed a "interviewer[']s rating guide," exhibit 7 at the NEOC hearing, for each candidate. After the interviews they tallied their scores and discussed the candidates.

The defendants have asserted that two committee members rated Fischer first and one rated Shaw first. Hendrickson thought he rated Shaw first. Hruza thought he had too, but also testified that he may have rated Paul Wood first and Shaw second. Avery rated Fischer first. It is not clear what the exact interview ratings were, as the notes were not saved.

The committee chose Fischer for the position. The assigned reason was that he "demonstrated better ability to relate to other staff and residents"; Shaw was the committee's second choice. Exhibit 8 at NEOC hearing. Hruza said that his basis for agreeing with the stated rationale was the interview. After reaching its decision, the committee submitted the "affirmative action plan applicant referral record" without signing the certification "that the procedures used in the selection and the offering of employment have been conducted in accordance with the intent of equal opportunity employment." *Id.*

## III. ANALYSIS OF THE DEFENDANTS' EXPLANATION FOR PROMOTION OF FISCHER OVER SHAW

In response to Shaw's prima facie showing of discrimination the defendants have met their obligation to come forward with a legitimate nondiscriminatory reason why Fischer, not Shaw, was promoted: Fischer "demonstrated better ability to relate to other staff and residents." Shaw has the burden of proving by a preponderance of the evidence that this rationale is a pretext shrouding discrimination. One way she may meet her burden is to show that the explanations for how the defendants

reached their conclusion lack merit, leaving no other explanation than discrimination to explain their choice. *See, e.g., Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Colon v. Sorensen,* 668 F.Supp. 1319 (D.Neb.1987) (memorandum of decision).

As evidence of Shaw's alleged lesser ability to get along with other employees, the defendants point to her irritation at the proposed cutback in the flex-time policy. She requested a special staff meeting. During the meeting, according to the defendants, she became angry and "out of control." The only illustrations for "out of control" are that Shaw interrupted some people when they attempted to talk and that she "shouted." Avery has raised his voice and pounded on a desk at least once when talking to an employee. McKenzie testified that Shaw always put in her forty hours each week, and Avery testified that Shaw abided by the change in flex-time rules even though she disagreed with them.

McKenzie testified that Shaw was "not as cooperative" in pitching in at the Center, but no examples were given except for Shaw's alleged "reluctance" to take counts because of her concern for male inmates' privacy. Shaw never refused to take a count. Nothing in her performance evaluations addresses counts or the general charge of being "not as cooperative."

To illustrate the assertion that Shaw failed to recognize McKenzie as her supervisor the defendants said that Shaw would take her vacation request form to Avery. Nothing in her performance evaluations suggests that her response to supervision is an issue. The inference from the evidence presented to me is that McKenzie became a supervisor, ultimately to be called the assistant center manager, through an informal appointment by Avery—not by an open, competitive promotion. If this inference is accurate, Shaw's purported statement to McKenzie that she "had difficulty over the way that I had come into the supervisory position and that she ... did not think of me as her supervisor," NEOC transcript at 66, suggests her appropriate disapproval of infor-

mal promotions through the "old-boys' network."

Several of Shaw's current or former coworkers testified that her ability to relate is as good or better than Fischer's, and that they thought she was the better candidate for the job. They felt that her rapport was good and that she was accessible. As argued by the plaintiff: "The split in the testimony certainly suggests that unfettered subjectivity of an all male management yielded the superiority accorded Mr. Fischer [in the area of ability to relate]." Plaintiff's brief at 31–32.

The defendants stated that Shaw's rapport with inmates was "not the best." The defendants assert that she was "not accessible" because she kept her door closed. Shaw closed her door because the hallway was noisy. Inmates who wished to enter could knock, but the defendants said some inmates told them they were afraid to knock. Neither the defendants nor the inmates ever communicated this to Shaw.

Avery testified to the effect that Shaw discriminates against sex offenders, but the only illustration of this was a remark made by Shaw during her probationary period (the first six months of her employment with the Department). No mention of such perceived discrimination ever was made to Shaw, and no subsequent illustration is before me now. Shaw testified that she does not discriminate based on an offender's crime.

The defendants said, as noted in her 1982–83 performance evaluation, that she needed to give more assistance to less capable offenders in finding jobs. Shaw stated that she is "firm but fair" with offenders and pushes them to take more responsibility for their own lives. Shaw said that she had little choice but to be verbally firm with offenders because the only option the program permits for dealing with inmates other than verbal counseling is discharge from the program. McKenzie said that Shaw approached inmates with the attitude of an "overbearing, critical parent," giving as the illustration for this assessment Shaw's efforts to get inmate fathers to take responsibility for making child support payments. In the case apparently referred to by McKenzie, the child support payments were court-ordered.

■ I have read the cases cited by the parties in their briefs. There is no dispute as to the applicable legal standard. The facts of each discrimination case differ, and this one must be examined individually to determine whether impermissible discrimination was the cause of the defendants' decision not to promote Shaw. Because the defendants used subjective factors in making their promotion decision, the procedures employed in this case must "be closely scrutinized because of their susceptibility to discriminatory abuse." *Royal v. Missouri Highway and Transportation Comm'n,* 655 F.2d 159, 164 (8th Cir.1981).

> When the evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision should be subject to particularly close scrutiny by the trial judge.

*Id.*

■ The attitudes of Avery and Hendrickson, the nonuniform promotion process, and the weak explanations for the defendants' stated reason for their promotion decision require the conclusion that gender was the factor that tipped the defendant's promotion choice away from Shaw. Although evidence of Avery and Hendrickson's sexist statements and behaviors by itself does not conclusively prove that they considered the top candidates' gender in reaching their promotion decision, it makes it difficult to believe their testimony that they lifted themselves from the insensitivity of their usual attitudes as they made the promotion decision. It is a twist of reason to believe that persons committed to equal opportunity would subject one group of workers, here women, to demeaning and unprofessional remarks and behavior. If the defendants believe that their behavior and comments are benign, they might ask themselves why they do not call male employees endearing names, or why they do not penalize male employees for being so deficient in clerical skills that

they are unable to pull their share of the load when extra typing must be done or the minutes of staff meetings recorded.

■ The hearing officer, despite believing the testimony concerning the comments and behavior of the defendants, said of Hendrickson:

> The terms used by Hendrickson to address females would appear to be figures of speech which are the product of his generation rather than evidence of discrimination. There was no evidence that any female told him these terms were offensive. The remark about the tour guide was unnecessary if made, but ... is not evidence of any discriminatory intent.

Exhibit 101 at 23. If an employer referred to adult white males as men and adult black males as boys, a "product of his generation" explanation would not satisfy the requirement of equal, nondiscriminatory treatment. Neither does it here. Different treatment for women or racial minorities is discrimination even if the victims (often under the supervision and control of the discriminating person) dare not confront the person whose behavior is objectionable. Persons who historically have been the victims of discrimination are not the only members of society responsible for being sensitive to and eliminating both blatant and subtle discrimination.

> About Avery, the hearing officer said:
>
> Avery's conduct is more serious. His reference to women's bodies, weight gaining, maternal instincts, personal life styles, his assigning clerical tasks to females, and repeatedly calling females "the girls" after warning, indicates a discriminatory animus which relegated females to an inferior position in a professional environment. Although these actions were generally denied by Avery, and if made, may be a subconscious product of his background, their collective and repetitive nature makes them legally impermissable [sic] and in violation of both the letter and spirit of Exhibit 9 ["Policy Statement on the Sexual Integration of the Correctional Work Force"].

*Id.* at 24. The hearing officer concluded that Avery's conduct was the only evidence of a discriminatory animus, and, therefore, reduced the case to the question "whether his state of mind influenced the selection of Fischer over Sucha [Shaw]." *Id.* It is no understatement that the "discriminatory animus" evidenced in this case is the type of oppressive attitude that "relegate[s] females to an inferior position in a professional environment," thus denying them the same employment opportunities available to men. But there is more to this case than just Avery's personal biases isolated from all else.

Two of the three male members of the selection committee were men whose comments and behavior evidence, at best, a difficulty with seeing women as professional equals. Avery, who exhibited clear discriminatory animus in his daily interactions with female employees, appears to have been the most influential member of the committee. Avery also had a close personal relationship on the job with Fischer. Although Hruza felt he had an equal vote, he did not review the applications, employee files, or the job description prior to the interviews. Shaw's interview lasted only about five minutes. It is not likely that Hruza had an opportunity fairly to consider whether Shaw or Fischer was better at relating to staff and inmates; his beliefs on that issue were based on the opinions of Avery and Hendrickson.

Avery clearly preferred Fischer. Hendrickson contends that the interview was important for him to reach a decision, yet Fischer and Shaw were not given similar interviews. Hendrickson said it was not necessary because he was familiar with Shaw. Avery was familiar with Fischer, but that did not result in an aborted interview with Fischer. The selection committee did not ask the same questions of each applicant. The interviews were not conducted in an even, fair manner.

Both Shaw and Fischer were qualified for the job. The defendants' justification for the selection of Fischer reflects a post-decision effort to explain a choice motivated by Avery's preference to work with

someone he was comfortable with socially, another male who was a personal friend, rather than a female whose position might threaten his discriminatory attitudes and practices.

■ McKenzie, with the apparent approval of his supervisors, did not want to record all areas needing improvement on performance evaluations. Whether that approach, as an abstract philosophy, is good or bad is irrelevant. To the extent that failure to alert women with promotion potential of weaknesses sets them up for rejection when they seek promotions, the practice is unfair and a denial of equal employment opportunity. If supervisors really perceived a problem with counts, or with reporting to an immediate supervisor, or with being "cooperative," or with being accessible, or with treating different groups of inmates properly, that should have been brought to Shaw's attention before the time of a sex discrimination suit. Because the defendants reach back to gripes never communicated to Shaw, and because the examples they present of these alleged problems barely, if at all, support their assertion that the problems existed in any substantial form, I find them incredible explanations of Shaw's purportedly inferior ability to relate to staff and inmates.

There was no explanation of how Shaw's performance allegedly declined during the six months prior to the interviews, which adds nothing to the defendants' rationale for selecting Fischer.

The example before me of Shaw's allegedly "overbearing, critical" approach to inmates is her insistence that an inmate make a better effort to meet his judicially-imposed child support obligations. It is amazing to me to think that the defendants would disagree with this objective. If their criticism goes to Shaw's means of achieving this objective, Shaw's performance evaluations are devoid of any critique of her counseling techniques and there is no evidence that she ever was told to change them.

Both Fischer and Shaw received admonitions in their 1982–83 performance evaluations to improve their processing of paper-work. The credible criticism of Shaw advanced by the defendants to explain their promotion decision, and reflected in her performance evaluation, is the need for her to devote more attention to helping less able inmates find employment. It is unclear how this criticism, if it involves more than differing philosophies of inmate rehabilitation, reflects a reduced ability to relate to inmates and staff.

The defendants gave only one example of Shaw becoming angry and shouting, something that Avery himself has done on at least one occasion. Considered with the evidence concerning the biases against women's assertiveness and the testimony from several witnesses that Shaw was as good or better than Fischer at relating to staff and inmates, the incident does little to suggest that Shaw would not relate as well as Fischer in the assistant manager position. In short, it appears that Shaw's ability to relate is considered inferior to Fischer's by Avery, whose discriminatory animus concerning women is apparent and whose personal ties to Fischer were fairly strong, but is considered superior or at least equal by many persons who do not share Avery's biases.

## IV. EQUAL PROTECTION

Shaw alleges that Avery and Hendrickson discriminated against her in violation of her fourteenth amendment equal protection rights by promoting Fischer because he is male. "[A]n employee may sue her public employer under both Title VII and § 1983 when the § 1983 violation rests on a claim of infringement of rights guaranteed by the Constitution," *Day v. Wayne County Board of Auditors*, 749 F.2d 1199, 1205 (6th Cir.1984), but may not base the § 1983 claim merely upon the alleged deprivation of statutory rights under Title VII, *see, e.g., Johnson v. Ballard*, 644 F.Supp. 333, 337 (N.D.Ga.1986). *See also Headley v. Bacon*, —— F.Supp. ——, CV86–L–146 (D.Neb. Nov. 13, 1986) (memorandum of decision) (a plaintiff must bring her Title VII and § 1983 actions together or be barred by res judicata).

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). To win on her § 1983 claim, Shaw "must prove that the [defendants] acted with a ... discriminatory intent or purpose when they promoted [a male] instead of [her]." *Talbert v. City of Richmond*, 648 F.2d 925, 929 (4th Cir.1981) (race discrimination), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. at 563.

Both Title VII and the equal protection clause require Shaw to prove intentional discrimination.

> A plaintiff who alleges disparate treatment by a state employer is bringing essentially the same claim under Title VII as under § 1983. If there is liability under Title VII, there should be liability under § 1983. Similarly, if there was no discriminatory intent, there cannot be liability under either Title VII, on a disparate treatment theory, or § 1983.

*Grano v. Department of Development of the City of Columbus*, 637 F.2d 1073, 1082 (6th Cir.1980).

■ Shaw has shown by a preponderance of the evidence that the defendants intentionally discriminated against her because she is female. This establishes the type of intentional discrimination required to show that Avery and Hendrickson violated the equal protection clause. *Cf. Rose v. Eastern Nebraska Human Services Agency*, 510 F.Supp. 1343, 1355 n. 9 (D.Neb. 1981).

## V. REMEDY

■ Shaw has been discriminated against in violation of Title VII and the equal protection clause of the fourteenth amendment. For the violation of her rights under Title VII, Shaw is entitled to back pay, from October 24, 1983, to today

totaling $7,494.57. When the assistant center manager or comparable position again becomes available she shall be promoted to that position. Meanwhile, Shaw is awarded $122.16 biweekly as front pay.

■ Shaw seeks general compensatory as well as punitive damages from Avery and Hendrickson in their individual capacities for their violation of her equal protection rights. The defendants argue that they are entitled to a good faith immunity from liability for damages. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, ... assessed in light of the legal rules that were 'clearly established' at the time it was taken...." *Anderson v. Creighton*, — U.S. —, —, 107 S.Ct. 3034, 3038, 96 L.Ed.2d 523 (1987).

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* The defendants make no argument in support of their contention that they are entitled to qualified immunity. It would be difficult to argue that a reasonable corrections administrator would not know that gender discrimination in promotion decisions is unconstitutional.

Although "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages," *Memphis Community School District v. Stachura*, 477 U.S. 299, —, 106 S.Ct. 2537, 2545, 91 L.Ed.2d 249 (1986), compensatory damages may be awarded in § 1983 actions if there is proof that the violation caused the injury alleged, *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). "[W]hen § 1983 plaintiffs seek damages for violations of constitutional

**1340**

rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura,* 477 U.S. at ——, 106 S.Ct. at 2542. "[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'" *Id.* Although claims of "mental suffering or emotional anguish" are "essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others...." *Carey,* 435 U.S. at 264 n. 20, 98 S.Ct. at 1052 n. 20. "[A]n award of damages must be supported by competent evidence concerning the injury." *Id.*

■ The only evidence of injury is Shaw's testimony. She stated that she was "stunned at not being promoted," that her motivation on the job declined, that her enthusiasm no longer was there, and that she began to doubt herself. Her sick leave increased, she testified that she experienced sleeplessness for months, and suffered from stress-related headaches. She never consulted a doctor or counselor for any of these problems and was not on medication. No one testified to having observed any changes in her behavior or to having heard her complain of these conditions. The amount of general compensatory damages is small but genuine. A reasonable appraisal of that damage is $2,500.

■ To be entitled to punitive damages from the defendants for their violation of § 1983, Shaw must prove that the defendants were "motivated by evil motive or intent, or [acted in a way that suggests] reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The evidence in this case does not support Shaw's prayer for punitive damages.

Shaw is entitled to recover a reasonable attorney's fee. When the amount has been determined, judgment will be entered for the plaintiff against all defendants on the plaintiff's Title VII claim and against defendants Avery and Hendrickson on the plaintiff's § 1983 claim as follows:

1. back pay in the amount of $7,494.57,
2. front pay in the amount of $122.16 every two weeks until an assistant center manager or comparable position for which the plaintiff is qualified becomes available and to which she is appointed,
3. general compensatory damages of $2,500.00,
4. interest at the rate of ____% per annum on $9,994.57 from today until the judgment is paid and
5. taxable court costs.

IT IS ORDERED the plaintiff's counsel shall submit to the court within 10 days an affidavit setting forth his claim for attorney's fees; the defendants shall have 7 days thereafter to submit an affidavit in response.