Ronald M. HAYES, Randy L. Hagler, Darrell A. Price, David H. Holland, Robert A. Holl, Oswald D. Holshouser, Raymond T. Carlton, S. Vance Elstrom, and Mark E. Corwin, Plaintiffs,

v.

CITY OF CHARLOTTE, NORTH CAROLINA, Defendant,

v.

NORTH STATE LAW ENFORCEMENT OFFICERS ASSOCIATION, Intervenor Defendant.

No. C–C–91–158–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Sept. 1, 1992.

Louis L. Lesesne, Jr., Lesesne & Connette, Charlotte, N.C., for plaintiffs.

Jim D. Cooley, Womble Carlyle Sandridge & Rice, Henry W. Underhill, Stephanie H. Webster, James E. Ferguson, Ferguson Stein Watt Wallas, Adkins & Gresham, Charlotte, N.C., for defendants.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, District Judge.

THIS MATTER is before the Court on Plaintiffs' Motion for Partial Summary Judgment. A hearing was held in Charlotte, North Carolina, on July 14, 1992.

The Plaintiffs were represented by Louis L. Lesesne, Jr., Esquire. The Defendant City of Charlotte (hereinafter "City") was represented by Jim D. Cooley, Esquire. Intervenor Defendant North State Law Enforcement Officers Association (hereinafter "North State") was represented by James E. Ferguson, II, Esquire and Geraldine Sumter, Esquire.

## BACKGROUND

The Charlotte Police Department initiated a promotion process for sergeants effective November 5, 1987 which consists of three parts: a written examination, a promotion potential rating evaluation, and an oral interview board. Each part is equally important; an applicant for promotion may receive no more than 33⅓ points for any part with the maximum score being 100 points. This process has been approved by the Court and no black officer has contended that the process discriminates against blacks. After passing the written examination, each applicant is assessed by the applicant's first and second level supervisors. Those supervisors then complete a "Promotional Potential Rating Form" and assign the applicant a score for this phase. The applicant next appears before a board for an interview and is assigned a score for that part of the promotion process. Those

applicants who complete all three phases of the promotion process are placed on an eligibility list. All promotions to the rank of sergeant are made from this list in accordance with Charlotte Police Department General Order No. 18 which provides in Part IIB:

> B. For both the Captain's and the Sergeant's promotional process, the combined score from all phases of the process will determine the order of consideration for candidates, but not necessarily the order of promotions.

After receiving recommendations from his subordinates, D.R. Stone, the City's Chief of Police, (hereinafter "Stone"), makes the final decision on promotions. (City's Memo in Response to Plaintiffs' motion for Summary Judgment by Defendant City of Charlotte, p. 5). As a result of a lawsuit filed by the North State Law Enforcement Officers Association (*North State Law Enforcement Officers Association, et al. v. The City of Charlotte, North Carolina*, Civil Action No. 2938) a consent order was filed in July 1974 by the Honorable James B. McMillan, which was amended by consent orders dated May 1, 1979 and July 2, 1990. Paragraph 5 of the consent order in connection with the promotion of sergeants reads as follows:

> 5. Effective immediately at least six (6) of the next fifteen (15) promotions to the rank of Sergeant shall consist of qualified black Patrolmen. In the event that the next fifteen (15) promotions are not made simultaneously, the promotion of qualified black officers to meet this goal shall be made at the rate of one (1) qualified black officer for every two (2) qualified white officers. Thereafter, the percentage of qualified black officers promoted to the rank of Sergeant during each successive six-month period shall conform as nearly as possible to the percentage that black Patrolmen comprise of all Patrolmen employed by the Police Department at the commencement of each such six-month period, **until the percent of black Sergeants comprises at least twenty percent (20%) of the total number of Sergeants employed by the Police Department.** The first of the foregoing six-month periods shall commence as of the first day of the month immediately following the month in which the last of the next fifteen (15) promotions to Sergeant is made.

(Emphasis added).

Reports filed with the Court since the original order 17 years ago indicate that the goal of 20% of the total number of sergeants employed by the police department being black was reached in 1987. (Stone Deposition, Exh. 2).

In this case the sergeant promotion roster was comprised of 74 names, ranked 1 through 74 (Ex. 1, Stone Depo. Part 1—names omitted).

### Charlotte Police Department

In their complaint, filed May 23, 1991, Plaintiffs allege that each of the Plaintiffs are now, and were in February of 1991, employed as police officers by the Defendant City of Charlotte. The Plaintiffs further allege that in February of 1991, the City promoted 21 then City police officers to the rank of sergeant. Each of the Plaintiffs, all of whom are white, applied for promotion. None of the Plaintiffs were promoted and their complaint asserts that they were passed over solely because of their race. As such, the Plaintiffs allege that the actions of the City violate the Due Process Clause and the Equal Protection Clause of the United States Constitution. The Plaintiffs also state claims under Title 42, United States Code, section 1983. Further, the Plaintiffs assert that as a result of the Defendant's illegal allegations the Plaintiffs have been damaged.

In its answer, the City denies that each Plaintiff was qualified to be promoted and that it promoted other officers rather than the Plaintiffs solely because the Plaintiffs are white. Further, the City denies that it acted in violation of either the United States Constitution or statutory prohibitions. In defense of its decision not to promote the Plaintiffs, the City asserts four defenses. The City first asserts that even absent the consideration of race as a factor in the promotion process, none of the

Plaintiffs would have been promoted to sergeant. Second, the City asserts that its actions were compelled by the successive Consent Orders entered by Judge McMillan in the *North State* case. However, as will be discussed below, the City has abandoned its reliance on the *North State* Consent Order. Third, the City asserts that its use of race as a factor in the promotion process is narrowly tailored to meet the City's compelling interest in remedying the effects of past underrepresentation of blacks at the rank of sergeant in the City police force. Finally, and in the same fashion, the City asserts that its use of race as a factor in the promotion process is narrowly tailored to meet the City's compelling governmental interest in maintaining an integrated police force conducive to maintaining good community relations with all segments of the City's population.

In February 1991 Stone selected 21 persons for promotion to sergeant. He selected the first eighteen in the order of their rank on the eligibility list, one of whom was black. Because Stone understood he had to select four black officers out of 21 promotions, he skipped over a number of white officers to the black officers ranked 29th, 62nd, and 74th. Of the nine Plaintiffs, two were ranked 21st and 25th on the eligibility roster, and thus ahead of the black officer number 29, who was selected. The remaining seven white Plaintiffs were all ranked ahead of the black officers numbered 62 and 74 who also were selected for promotion. As to rank No. 29 on the list of qualified candidates, Stone testified there was no reason for her promotion other than her race and sex. (Stone Depo. pp. 20–28). Stone further testified that Nos. 62 and 74 probably would not have been promoted had they been white. (Stone, Depo. 28–30).

## DISCUSSION

### *Qualifications of Plaintiffs*

Contrary to the City's denial of this fact, Stone testified that with one exception, each of the Plaintiffs were qualified to be promoted to sergeant. The one exception was No. 21 on the eligibility list, whom Stone believed unqualified for promotion because of his disciplinary problems. The exact testimony of Chief Stone appears on pp. 19, 23–25 as follows:

Q. Now, you say the third—well, was there any other person who was passed over because of discipline?

A. Yes.

Q. And would that have been No. 21?

A. Yes.

Q. Anyone else?

A. Using the same phraseology of "passed over"?

Q. Right.

A. No.

Q. Okay. Let me ask you—you've seen the Answer that was filed on the City's behalf in this lawsuit, have you not?

(Counsel handed document to witness.)

(Witness reviewing document).

MR. COOLEY: Is there a particular part of it that you want to refer him to?

MR. LESESNE: Well, first—in just a second, I do. I want to see if he's seen it first.

A. Yes.

Q. Did you see it before it was filed with the Court?

A. I don't know.

Q. Okay. Did you also see a copy of the Complaint which the plaintiffs filed with the lawsuit, this document?

(Counsel handed document to witness.)

A. Yes.

Q. Would you look at paragraph 13 of the Complaint, this document here (indicating). And it alleges that, "Each plaintiff applied and was fully qualified to be promoted to Sergeant"; is that correct?

A. Yes, sir.

Q. And would you look at paragraph five of the [P. 24] Answer. It think it's five. I'm sorry, paragraph four of the Answer. Do you know why the City would deny that the plaintiffs were fully qualified to be promoted to Sergeant?

MR. COOLEY: He's already told you on No. 21.

MR. LESESNE: Well', I'd like to ask—get his answer, not yours.

MR. COOLEY: Okay.

A. Would you repeat the question?

Q. I understood your testimony just now to say that each of the people on the list was fully qualified to be promoted; is that correct?

A. Each person on the list had competed in the process for Sergeant and had passed the process and earned the right to be on the eligibility list.

Q. Well, are they or are they not qualified to be Sergeant?

A. Each one has to be viewed in terms of the factors that I earlier discussed and decisions made based upon not only the eligibility list but those other factors.

Q. Okay. Well, tell me, if you would, since we're talking about qualifications, which one of the plaintiffs are not qualified to be promoted to [P. 25] Sergeant?

A. Each one of the plaintiffs are qualified in terms of having competed in the process and having passed, to the extent they're on the eligibility list.

Q. Does that make them qualified or not?

A. It makes them qualified for consideration by the Chief of Police.

Q. Is there any of them that's not qualified to be promoted to Sergeant?

A. In my opinion, No. 21 did not qualify to be promoted.

Q. And is not qualified now; is that right?

A. Before a current decision would be made, I would go back through the process I earlier described in terms of input from the Executive Staff as well as conversations with them.

Q. If you would, take each of the other plaintiffs and tell me whether he is or is not qualified?

A. With the information I have presently at hand, they are qualified.

Q. Other than No. 21?

A. Yes.

Deposition of D.R. Stone at 19–20, 23–25. The black officers who were promoted and who were not ranked in the first 21 on the eligibility list were ranked Nos. 29, 62, and 74. Stone's testimony as to those officers was as follows:

Q. Other than No. 29's race and sex, would there be any other reason that she would have been promoted?

A. No.

. . . .

Q. Well, what I understand you're saying is that it was important to promote No. 62 because he was black—is that right—to have a representation of black sergeants?

A. Yes.

Q. And if No. 62 had been a white officer with the same record, would he have been promoted to Sergeant?

A. I do not know, but probably not.

Q. Okay. What about No. 74? No. 74 is also a black officer, is he not?

A. Yes.

Q. And is No. 74 male or female?

A. Male.

Q. And would he have been promoted, had he not been black?

A. I do not know, but probably so.

Q. And why would that be?

A. The same answer that I've given: that it's my belief that the police department needs to be integrated in terms of police employees—police officers as well as supervisors.

Q. I'm not sure I follow that. If he had not been black, how would his promotion have assisted in the integration of the police force?

A. If he had not been black?

Q. Right.

A. It was—the question—would he have been promoted if he had not been black?

Q. Yes, sir.

A. I do not know, but he probably would not have. I misunderstood your question.

Q. All right. And that would be the same for No. 62, as I understood your previous answer; is that right? If No. 62 would not have been black, he probably would not have been promoted?

A. Correct.

Q. Okay. Was there any factor other than race and—in the case of No. 29—

sex that explains the selection of Nos. 29, 62, and 74?

A. No.

*Id.* at 27, 29–31.

Clearly, Stone felt that he should make 20% of all promotions from the minority officers on the eligibility list, either because of the 1974 consent decree or because he was persuaded by a societal need.

One black officer ranked No. 11 on the eligibility roster was promoted. The next ranking black officer on the list was No. 29. The next ranking black officer was No. 37. He was not promoted because of his disciplinary record and because he was not recommended by the executive members of the police department. Stone Depo. at 70. Following No. 37 the next two black officers were ranked No. 62 and 74—at the very bottom of the promotion roster. Thus, Stone was able to obtain only one black officer who ranked in the first 21 and three black officers by skipping over a large number of white officers who were ranked higher. He did that solely for the purpose of obtaining three black persons, clearly a discrimination against white officers. The Plaintiffs have presented uncontradicted evidence that all Plaintiffs other than No. 21 were qualified, but white officers were passed over for the sole purpose of obtaining three additional black officers. For the 21 positions to be filled, Chief Stone understood that four of those had to be black. Stone Depo. at 20.

Chief Stone deviated from the ranking of people on the promotion roster. One white officer, No. 16, asked that he not be considered for personal reasons. Stone Depo. at 18–19. The white officers ranked Nos. 8 and 21 were passed over for disciplinary reasons. Stone Depo. at 19.

Therefore, of the officers ranked 1 through 21, one black officer, No. 11, was promoted. The white officer ranked No. 16 asked that he not be considered for personal reasons. Officers ranked 8 and 21, both white, were not promoted for disciplinary reasons. That left three places to be filled. According to paragraph IIB of General Order No. 18 the next three officers to be considered in order of rank were No. 22, 23, and 24.

However, the Chief had a problem. He understood that he needed to promote three more blacks to sergeant, and Officers ranked 22 through 28 were white as were the remaining ranked officers through No. 74, except for officers ranked 29, 37, 62, and 74.

In addition to rank on the eligibility list and race, Stone also considered the disciplinary records of each listed officer. There are 4 classifications of violations by officers: A, B, C, and D. An "A" violation is one resulting in a suspension of active time. Stone Depo. at 70–71. It is the policy of the City Police Department that any officer who has sustained an "A" violation in the *past five years* resulting in active suspension will not be promoted. Stone Depo. at 71, 1. 16–25; p. 72, 1. 1–19. An "A" violation is more serious than a "B", "C", or "D" violation. Stone Depo. at 64, 1. 19–21.

White officer ranked No. 21 was last convicted for an "A" violation in 1983. He was passed over. White officer No. 8 had one "A" violation and was passed over. Black officer No. 11 had two "A" violations and was promoted. The disciplinary record of Officer No. 11 indicates that he used force against prisoners. The Court believes it would be useful to the reader to set out verbatim the testimony of Chief Stone as to the disciplinary problems of white officers No. 8 and No. 21 who were not promoted and black officer No. 11 who was promoted.

Chief Stone's testimony began on P. 64, 1. 22.

Q. And Officer No. 21's last conviction for an "A" violation was in 1983; is that right?

A. Yes.

(Deposition Exhibit 5 marked for identification.)

[P. 65]

Q. I've just shown you what I've marked as Exhibit 5, which is the disciplinary record for Officer No. 11; is that correct?

A. Yes.

Q. Why is it that Officer No. 11's disciplinary record did not disqualify him from promotion?

A. It did not disqualify him.

Q. I understand that. What it is [sic] about his record that is different from Officer No. 21's that would not disqualify him?

A. The seriousness of the allegations and the recommendations of the Executive Staff.

Q. Well, look at the bottom of the first page of Exhibit 5. This officer "Kneed a prisoner in the groin, pushed him into the police car, and kicked the door against the prisoner's legs three or four times while the prisoner was being arrested and handcuffed." Is that not a serious offense?

A. Yes.

Q. Okay. And then on the top of the next page, he "Repeatedly struck a prisoner with his hands and fists after having gained control of him while being booked at the jail." Is that not a serious offense?

A. Yes.

[P. 66]

Q. Okay. How would you compare this record with that of Officer No. 21? Is it your testimony this is not as bad a record?

A. The number of days suspended would indicate the severity of the sustained allegations based upon the hearing of the disciplinary hearing board.

Q. So if an officer received fewer days off, even though the summary of the incident might be similar, you say it's a less serious incident?

A. I'd say they're both serious, but one's perhaps more serious than the other.

Q. Well, when you—if you try to compare these two, No. 11 and No. 21, how would you compare them?

Look at the first incident for No. 21. In 1974, he was convicted of "Grabbing someone by the arm, telling them he was not worth a shit, and spitting on him two times." Is that more serious than the two incidents for Officer No. 11?

MR. COOLEY: Objection. He's just explained to you that he has to rely to some extent on what the disciplinary board did as opposed to the written summary that's contained here. I think you're asking him the same question again.

Q. Well, let me ask this. Is the fact that Officer No. 21 was suspended for 15 days—does that make that incident more serious than the two for Officer No. 11, which we just discussed?

[P. 67]

A. Standing alone, by itself, in the absence of any other sustained allegations, I do not know that it would have been anymore severe. Coupled with the other frequency and the disposition of the other cases, the answer would be yes.

Q. All right.

(Deposition Exhibit 6 marked for identification.)

(Counsel handed document to witness.)

(Witness reviewing document.)

Q. Okay. I've just shown you Exhibit 6. That's the disciplinary summary for Officer No. 8; is that correct?

A. Yes.

Q. And Officer No. 8 is the officer that you say was passed over for a promotion because of his disciplinary record; is that right?

A. Yes.

Q. And Officer No. 8 is white; is that right?

A. Yes.

Q. And is it your view that his disciplinary record is more serious than that of Officer No. 11?

A. In regards to Candidate No. 8?

[P. 68]

Q. Yes, sir.

A. The frequency of the same type of violation was the determining factor.

Q. Tell me what you're referring to there.

A. Absence from duty.

Q. Okay. At least one of those absence from duties is a "B" violation—is that right—in June of 1990?

A. That is a "B", yes, sir.

Q. Okay. Is it your view that the absence from duty that Officer No. 8 sustained is more serious than the use of force against prisoners which Officer No. 11 was involved in?

A. It was not compared as to being more serious. He was not promoted because of the frequency of the same type of violation and the recommendation from the Executive Staff.

Q. So if he has a number of similar violations, it's a different consideration as having a number of different types of violations: [sic] is that what you're telling me?

A. The frequency of violations, the nature and severity of the violations, the number of violations are all considered.

Q. Well, both officers have seven violations, do they not?

[P. 69]

A. No. 8 and Number—

Q. Eleven.

A. No. 8 has six on my list.

Q. Okay.

A. No. 21 has ten, according to the way I count them.

Q. I'm sorry. We were comparing No. 8 and No. 11.

A. Number 11? Seven.

Q. Okay. So No. 11 actually has more violations than does No. 8; is that right?

A. Yes.

Q. And No. 11 had two "A" violations; is that right?

A. Yes.

Q. And No. 8 only one?

A. Yes.

Q. Would you agree with me that the— as comparing the No. 11 and No. 21, that the incidents are more recent for No. 11 than they are for No. 21? I'm sorry. I'm asking about No. 11 and No. 21. This is this one.

A. More recent violation is No. 11.

Q. Okay.

Stone Depo. at 64–69.

White Officers No. 22 and 23 were disqualified on the basis of the policy that the Police Department would not promote anyone if he had sustained an "A" violation in the past five years with active suspension. Stone Depo. p. 72, 1. 2–23. Officer No. 37 is a black officer. He was not promoted because he had sustained an "A" violation within the past five years with suspension of active time. Stone Depo. p. 70, 1. 6–25, p. 71, 1. 1–15. His principal violation was that his driver's license was suspended and he failed to notify the department.

Randy Hagler, one of the Plaintiffs, would have been promoted had not the three black officers Nos. 29, 62, and 74 been promoted. Stone Depo. p. 72, 1. 24–25; p. 73, 1. 1–9.

The Charlotte Police Department has a process for selection of candidates for promotion which had been approved by this Court "... to date, neither North State nor any other individual has challenged the promotion process including the written testing component, as being discriminatory. North State has indicated in this very action, however, that it is contemplating bringing suit against the City to enjoin the use of the written test as having disparate impact on blacks" (P. 6, City of Charlotte Memorandum in response to Plaintiffs' Motion for Partial Summary Judgment). This process for selection of candidates for promotion to Sergeant has been disregarded and the Charlotte Police Department has proceeded to promote blacks simply because they are black. The selection process had been approved because it was determined by this Court to be a fair process where all applicants regardless of race were eligible to be considered for promotion. The promotion examination was found by Judge McMillan in his 1990 order to be job related. His Order states in Paragraph 4:

Defendants have submitted satisfactory evidence that the proposed new written Promotion Examination may be job related and that the Court so finds.

In Paragraph 6 of the 1990 order Judge McMillan stated:

The Defendants should be permitted to use the new Promotion Examination, to be developed and validated in the manner set forth above, and to use its results as outlined in their motion, unless and until

the Plaintiffs have shown that the use of the Promotion Examination and its results constitute unlawful racial discrimination.

The process was designed not only to be fair but to provide the City with the best supervisory personnel and consequently the best police department possible. Those purposes are being frustrated for the sake of a quota system. If the police department is not going to abide by the process, then why have any? Why not allow the old "crony" system to prevail where political friends, allies, and relatives are hired? Why have officers, black or white, strive to improve themselves in an attempt to progress in their chosen field? In short, why have a process at all if the best are not chosen based on their record, their physical and mental ability rather than the color of their skin?

In summary, of the first 21 ranked officers, eighteen were promoted, one of whom, No. 11, was black. White officers Nos. 8, 21, 22, and 23 were denied promotion because of disciplinary problems. White officer No. 16 did not wish to be promoted for personal reasons. White officers ranked 24 through 28 were not considered when Stone skipped over to black officers ranked No. 29. Stone then skipped over white officers Nos. 30 through 36 and 38 through 61 and 63 through 73. Therefore, a total of 47, or 90%, of the eligible white officers ranked 24 through 73 were not considered, in order to promote black officers ranked 29, 62, and 74. Black officer ranked 37 was not promoted because of disciplinary problems.

The Chief's reason for appointing the three black officers who were ranked below the passed over white officers was that he understood he needed 20% of all those promoted to sergeant to be black. Further, in his affidavit filed November 1, 1991, Stone states:

> I believe that the City has a compelling interest in achieving and maintaining a racially integrated police department at its various rank levels in order to be an effective law enforcement organization. My conviction in this regard is based not only upon my personal experience as a law enforcement officer, but also is supported by what I understand to be the recommendations of various governmental studies and reports.

Affidavit of D.R. Stone at 3.

## CONCLUSIONS OF LAW

### *The Court's Standard for Summary Judgment*

The Court's standard for considering motions for summary judgment is clear. Summary Judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see* F.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial").

When considering motions for summary judgment, courts must view facts and inferences from the facts in the light most favorable to the party opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational factfinder to find for the non-moving party, no

genuine issue for trial exists and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

The Fourteenth Amendment to the United States Constitution provides:

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

U.S. Const. amend XIV, § 1 (emphasis added).

The protections afforded by the Fourteenth Amendment are further reflected in Title 42, United States Code, Section 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C.A. § 1983 (West 1990).

### Issue of Fact

There does not appear to be any issue of fact as to whether race was a determining factor in the selection of three of the four black officers promoted to sergeant in February, 1991. Chief Stone testified in his deposition that the three black officers ranked Nos. 29, 62, 74 on the eligibility list would probably not have been promoted if they had not been black. (Stone Depo. p. 27, l. 7–10; p. 29, l. 13–25; p. 30, l. 1–24).

In its Memorandum responding to Plaintiffs' motion for partial summary judgment the City does not deny that race was the determining factor in the promotion of the three black police officers to sergeant:

There is no dispute that in February 1991 certain black candidates were promoted to the position of sergeant in the Charlotte Police Department who would likely not have been promoted had they been white. (Deposition of Chief D.R. Stone at pp. 29–30). The evidence as elicited through the deposition of Chief D.R. Stone is that preference was given to certain black candidates for two reasons: 1) the existence of the consent orders in effect in the *North State* case and 2) the "belief that the Charlotte Police Department should be integrated and be reflective of the community at large, both in terms of police officers as well as the supervisors." (Stone deposition at pp. 21, 29–32, 36 and 39).

Memorandum in Response to Motion for Summary Judgment.

The City argues that the City's consideration of race is justified in order to achieve diversity at the rank of sergeant within the police department. Thus, the ultimate question for the Court is whether the reasons the City has enunciated are adequate to withstand the Plaintiffs' motion in the present state of the law.

The City has a promotion process which has not been challenged by any minority group. Now, it is not following the process, but has gone off on a mission to achieve an integrated supervisory force consisting of what it perceives to be an appropriate percentage of minorities. The City is trying to accomplish this goal by, in effect, eliminating from consideration for promotion 90% of the eligible white officers or, in more precise terms, by discriminating against white officers. The City attempts to justify this discrimination by asserting that the City has a compelling interest in achieving and maintaining a racially integrated police department at its various rank levels in order to be an effective law enforcement organization.

In effect, North State argues that because Charlotte is 31.8% black the City police force has an operational need to have the same proportion of black officers. North State defines "Operational Need" as referring to a law enforcement body's need

to carry out its mission effectively, with a work force that appears unbiased, is able to communicate with the public, and is respected by the community it serves.

North State and the City are asking this Court to impose a societal discrimination standard. The Supreme Court has never held that societal discrimination alone is sufficient to justify a racial classification.

> Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy.
>
> No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and over expansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986).

Judge McMillan approved the promotion examination developed by the City in his 1990 amendment to the 1974 Consent Order and found it to be job related. North State consented to this language. Yet, North State now complains that the use of the examination is discriminatory because the number of black officers who passed the examination is less than four-fifths (4/5's) of the number of white officers who passed the test. Apparently, North State's argument is that unless a certain percentage of black officers pass the approved job-related test, it must be discriminatory. There either must be some standard or no standard. In any event, the examination was only one of the three components of the promotion.

*The 1974 Consent Order as Amended*

North State argues that Section 108 of the Civil Rights Act of 1991 is retroactive and therefore applicable to the 1974 Order as amended. North State's argument is that the Plaintiffs therefore had an opportunity to contest the 1974 Order and its amendments. However, the 1991 pro-

motions of black officers were not made pursuant to the 1974 Court's Order as amended.

As a defense to the charges of the Plaintiffs, the City pled those Consent Orders. However, it has apparently abandoned that defense both at oral argument and in its Memorandum in Response to Plaintiffs' Motion for Partial Summary Judgment. The City has written:

> The City sets forth compliance with the North State consent orders as a bar to any recovery by plaintiffs in its second further defense contained in its answer. For purposes of this motion only, the City does not rely on this defense as a justification for its promotional policy. The City concedes that *in the context of prospective injunctive relief,* the Supreme Court case of *Martin v. Wilks,* [490 U.S. 755] 109 S.Ct. 2180 [104 L.Ed.2d 835] (1989) precludes such reliance by the City upon the prior consent order. Also, for purposes of this motion only, the city does not contest the plaintiffs' standing to seek injunctive relief, although the City does contest the standing for any plaintiff to recover damages in the absence of proof that he would have been promoted in the absence of the consideration of race as a factor. *See Regents of University of California v. Bakke,* [438 U.S. 265] 98 S.Ct. 2733, 2743, n. 14 [57 L.Ed.2d 750] (1978). The City would also contend that its compliance with the consent orders should be a bar to any recover of damages by a plaintiff in this action, even if such plaintiff could prove that he would have been promoted in the absence of consideration of race.

Memorandum in Response to Motion for Partial Summary Judgment at 7, n. 1.

In any event, even if Section 108 of the 1991 Civil Rights Act is retroactive, this Court does not need to decide that question in this case, since the 1991 promotions were not required by the 1974 order, and the City has not relied on the 1974 Orders. The City's argument is simple:

> The City has a compelling interest in achieving and maintaining a racially integrated Police Department at its various

rank levels in order to be an efficient law enforcement organization. The sergeant promotional practices are narrowly tailored to further this interest by insuring adequate minority representation without unduly prejudicing white candidates' opportunities for promotion.

*Id.*

North State apparently relies on the same argument:

The February 1991 promotions were made from a rank ordered listing. Even a cursory review of that listing would show that if the twenty (20) [sic] positions were filled from the eligibility list by using a strict adherence to the rank ordered list, that only one (1) of the qualified blacks on the list would have been promoted to the rank of sergeant. This evidence alone is sufficient to form a "firm basis for concluding that remedial action was appropriate." 476 U.S. at 292–293.

Intervenor's Memorandum in Response to Plaintiffs' Motion for Partial Summary Judgment at 17.

Therefore, the Court will address the argument that the City has a compelling interest in maintaining a "... racially integrated Police Department in its various rank levels in order to be an effective law enforcement organization ..."

In support of that argument, the City relies on *Talbert v. City of Richmond,* 648 F.2d 925 (4th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982). *Talbert* on its face may appear to be controlling in the case before the Court. However, aside from the fact that the holding of *Talbert* seems to be rejected by both *City of Richmond v. J.A. Croson Company,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) and *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), it appears that *Talbert* is distinguishable from this case on its facts.

In *Talbert,* the City Charter had established a "rule of five," which required the Director of Public Safety (its appointing authority) to consider for promotion a number of candidates equal to the number of vacancies plus five. In *Talbert,* there were three vacancies in the rank of major. Therefore, the eligibility list for the three vacancies contained eight names. As in this case, the Director chose the first two candidates in order of rank and then skipped over the plaintiff and a number of other white candidates and recommended a black candidate who was number eight in rank on the certified eligibility list. On Talbert's complaint that the City had violated his rights under the equal protection clause of the Fourteenth Amendment the District Court awarded damages and injunctive relief to Talbert.

In *Talbert,* the Chief of Police, in stating his reasons for recommending the appointment of the black officer, Miller, stated among other things:

... For the record, I believe that this additional comment is necessary. Captain Miller is the first Black who has ever been in contention for promotion to Major. He has reached this plateau on his own merit. In a City with a population which is approximately 50% Black, I feel it would be to the City's advantage to have a man of his caliber and reputation in a top level policy making position. I do not feel that the point difference between positions 3–4–5–6 and 8 is so great that we should side step this opportunity to promote a deserving individual and at the same time to comply with the spirit and intent of the City's Affirmative Action Plan.

*Talbert* at 927.

The Director accepted the Chief's recommendation and promoted Miller. The *Talbert* District Court found:

Now, his reasons for doing that are in most respects laudatory. His reason for doing it is because he thought it was best for the police force; he thought it was best for the City; he thought that it would help the City in its relations with the people that the police force is required to maintain order among, and to enforce the law. He thought it would be good for the spirit and morale of the citizens. I'm certain all of those things entered into [the Chief's] and [the Di-

rector's] determination to make this promotion on the basis of race.

The district court held that consideration of Miller's race was impermissible, and held that the city and its officers had violated Talbert's constitutional right to be free of discrimination on the basis of race, and awarded him damages, injunctive relief, costs, and attorney's fees. *Talbert* at 928.

In reversing the District Court, the Fourth Circuit held controlling the principles enunciated in *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). 438 U.S. at 318–19, 98 S.Ct. at 2762–2763. *Talbert* at 929.

The Fourth Circuit then reviewed the holding in those cases and listed the criteria prescribed by the court for determining whether a state's asserted reason for its action is a cloak for invidious discrimination that violates the equal protection clause. Those criteria are summarized as follows:

1. *Washington v. Davis*—reiterated the cardinal principal: "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause", 429 U.S. at 265, 97 S.Ct. at 563.

2. *Arlington Heights*—prescribes the following criteria for "determining whether invidious discriminatory purpose was a motivating factor" for the government's act: first, the impact of the act— that is, whether it burdens one race more than another; second, the historical background of the challenged decision; third, the degree to which the action departs from either normal procedural sequence or normal substantive criteria; and, finally, the contemporaneous statements of those making the decisions. 429 U.S. at 266–68, 97 S.Ct. at 564–565. This summary, though not exhaustive, identifies the "subjects of proper inquiry in determining whether racially discriminatory

intent existed. 429 U.S. at 268, 97 S.Ct. at 565." 648 F.2d 925, 929.

In the case before the Court, there was proof of racially discriminatory intent by Chief Stone in recommending the promotion of three of the three eligible black officers on the eligibility list solely because they were black while at the same time eliminating from consideration over 90% of the white officers in order to promote the black officers. (One black officer had ranked No. 11 and was promoted and black officer No. 37 was not considered for promotion for disciplinary reasons).

Chief Stone's statement at his deposition was that none of the black officers Nos. 29, 62, and 74, would probably have been promoted had they not been black. It would appear that Stone, at the time of the promotions, considered and recommended only the black officers simply because they were black, contrary to the provisions of General Order No. 18, Paragraph IIB, which provided that for the sergeant's promotional process, the combined score for all parts will determine the order of consideration.

The contemporaneous testimony by Chief Stone at his deposition was that he wanted to fill four of the 21 vacancies for sergeant with black candidates since he believed he needed 20% of all sergeants to be black to satisfy the requirements in accordance with the 1974 consent order as amended. Chief Stone's affidavit testimony is to the effect that the procedures in General Order No. 18 are inadequate for the general operational needs of the Police Department, and that he believed the City had a compelling interest in achieving and maintaining a racially integrated police department.

It appears that in *Talbert* one third of the vacancies for major was filled by a black officer, with two white officers being appointed to the other two vacancies. The black officer, Miller, was the first black who had ever been in contention for promotion to major. Prior to his appointment only white officers including Talbert were promoted to major. Moreover, the City had just been through a lawsuit by the Black Officers Association which terminat-

ed in a consent decree which recited in part:

> The City of Richmond also denies that it has engaged in such racially discriminatory acts or practices, or pattern or practice, relating to employees of the Richmond Bureau of Police since the effective date of the 1972 Amendments to 42 U.S.C. § 2000e et seq. But while denying liability to the named plaintiffs and the plaintiff class, the defendants realized that certain past practices within the Bureau may have given rise to an inference of discrimination against black persons. The individual defendants and the City have made good faith efforts to rectify and prevent racial discrimination in employment in the Richmond Bureau of Police and since June 11, 1974, the percentage of black employees has substantially increased. The defendants state that for the purpose of avoiding any further inference of discrimination, the City of Richmond has heretofore taken certain steps to eliminate policies, practices and procedures which were possibly discriminatory or potentially discriminatory against black persons. 648 F.2d at 929, 930.

The third inquiry—the degree to which the action departs from either the normal procedural sequence or the normal substantive criteria, when applied in *Talbert*, revealed that like the case at bar, the Chief here believed that the City has a compelling interest in achieving and maintaining a racially integrated police department at its various rank levels in order to be an effective law enforcement organization. Further, in *Talbert*, there was a finding that the City had previously promoted a white officer whose score had been lower than the black officer's score, and that other white officers whose scores were not significantly higher had been appointed to this rank. Additionally, the black officer, Miller, had been an acting major for more than a year and his ability to discharge his duties was one of the reasons he had been recommended for promotion. Talbert had not served as an acting major. 648 F.2d at 930–31.

Finally, in *Talbert*, the contemporary statements of the Chief revealed:

> (1) the Chief considered both Miller and Talbert to be qualified for promotion; (2) Miller had already been performing as an acting major in his capacity as Inspector and the Chief thought it desirable to make this assignment permanent; (3) the Chief recognized Miller's personnel assessment center score was lower than Talbert's; (4) the Chief did not view this differential as disqualifying Miller from promotion; and (5) appointing for the first time a qualified black officer to a top level policy-making position would benefit a city whose population was approximately 50% black. The testimony of both the Chief and the Director reaffirmed these contemporary statements. 648 F.2d at 931.

Contrary to the facts in *Talbert*, the case at bar revealed the following: First, there is no evidence that the black officers who were promoted were the first black officers who had been appointed as sergeant. As a matter of fact, at least 20% of the sergeants were black in 1987, and that percentage, or more, has been maintained since that date. Second, the historical background of the case at bar is that the City has never acknowledged that past practices gave rise to an inference of discrimination. Third, the consideration for promotion of the black officers ranked Nos. 29, 62, and 74, and the corresponding disregard of eligible white officers, was contrary to General Order No. 18, Par. IIB which provided that for the sergeant's promotional process the combined score for all phases will determine the order of consideration. Fourth, there has been no finding in this case that the City had previously promoted a white officer whose score was lower than the black officers promoted in this case, and there was no evidence that any of the black sergeants appointed in the case at bar had acted in that capacity. Finally, the contemporaneous statements by Chief Stone clearly indicate that except for the black officer ranked No. 11, the black officers who were appointed, Nos. 29, 62, and 74, would probably not have been appointed had they not been black.

The Supreme Court has revisited this question in the recent cases of *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) and *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In *Wygant*, the court noted that:

> ... public employers, ... also must act in accordance with a "core purpose of the Fourteenth Amendment" which is to "do away with all governmentally imposed discriminations based on race." *Palmore v. Sidoti*, 466 U.S. [429] at 432, 104 S.Ct. [1879] at 1881–1882 [80 L.Ed.2d 421] [(1984)]. These related constitutional duties are not always harmonious; reconciling them requires public employers to act with extraordinary care. In particular, a public employer like the Board must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination.
>
> Evidentiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees.... the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary. The ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative-action program. But unless such a determination is made, an appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior discrimination.

*Wygant*, 476 U.S. at 277–78, 106 S.Ct. at 1848–1849.

As was pointed out by Justice O'Connor writing for the Court in *City of Richmond v. Croson Co.:*

> The Equal Protection Clause of the Fourteenth Amendment provides that "[N]o State shall ... deny to *any* person within its jurisdiction the equal protection of the laws" (emphasis added). As this Court has noted in the past, the "rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights." *Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948). The Richmond Plan denies certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race. To whatever racial group these citizens belong, their "personal rights" to be treated with equal dignity and respect are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decisionmaking.
>
> Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.
>
> Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility. *See University of California Regents v. Bakke*, 438 U.S., at 298, 98 S.Ct., at 2752 (opinion of Powell, J.) ("[P]referential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth"). We thus reaffirm the view expressed by the plurality in *Wygant* that the standard of review under the Equal Protection Clause is not dependent

on the race of those burdened or benefited by a particular classification. *Wygant*, 476 U.S., at 279–280, 106 S.Ct., at 1849–1850; *id.*, at 285–286, 106 S.Ct., at 1853 (O'CONNOR, J., concurring). See also *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 105, 93 S.Ct. 1278, 1333, 36 L.Ed.2d 16 (1973) (MARSHALL, J., dissenting) ("The highly suspect nature of classifications based on race, nationality, or alienage is well established") (footnotes omitted).

Our continued adherence to the standard of review employed in *Wygant*, does not, as Justice MARSHALL's dissent suggests, see *post*, at [552, 109 S.Ct. at] 752, indicate that we view "racial discrimination as largely a phenomenon of the past" or that "government bodies need no longer preoccupy themselves with rectifying racial injustice." As we indicate below, see *infra*, at [508, 109 S.Ct. at] 729–730, States and their local subdivisions have many legislative weapons at their disposal both to punish and prevent present discrimination and to remove arbitrary barriers to minority advancement. Rather, our interpretation of § 1 stems from our agreement with the view expressed by Justice Powell in *Bakke*, that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Bakke, supra*, 438 U.S., at 289–290, 98 S.Ct., at 2748.

*Croson*, 488 U.S. at 491, 109 S.Ct. at 720–21.

The desire to have more black sergeants or other higher-ranking officers standing alone is not a sufficiently compelling reason to justify consideration for promotion for the black officers ranking lower on the eligibility list than the white officers who were not considered in order to make room for the promotion of black officers to sergeant. That is "discrimination for its own sake, forbidden by the Constitution." *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757.

In its argument, the City asserts:

The City does not rely upon a showing of past discrimination or gross statistical disparity in order to justify its consideration of race in the challenged promotional process. A showing of prior discrimination may under certain circumstances be a sufficient justification to employ affirmative action measures designed to remedy the present effects of past discrimination. *See, e.g., Wygant v. Jackson Board of Education*, [476 U.S. 267] 106 S.Ct. 1842 [90 L.Ed.2d 260] (1986). The City of Charlotte does not, however, admit that it has ever discriminated against blacks in its police department. There has been no such finding in the *North State* case, and the consent orders entered in that action do not address the issue of whether there has been any such discrimination.

... the City likewise does not intend to argue that the extent of past under-representation alone justifies its continued consideration of race for promotion to sergeant. The City is not prepared to undertake a statistical showing of disparity necessary to support such an argument. *See, e.g., Wygant, supra; Hazelwood School District v. United States*, [433 U.S. 299] 97 S.Ct. 2736 [53 L.Ed.2d 768] (1977); *Long v. City of Saginaw*, 911 F.2d 1192 (6th Cir.1990). While the third further defense in its answer alleges that the consideration of race as a factor is necessary to remedy the remaining effects of past under-representation within the Charlotte Police Department of black officers at the rank of sergeant, the City concedes for purposes of this motion that it cannot come forward with a sufficient forecast of statistical evidence to support justification of its consideration of race on the basis.

Even if the City could come forward with such a showing of prior minority under-representation, the City nevertheless does not wish to argue that maintenance of a court mandated promotional scheme is required in 1991 to protect blacks from discrimination by the City, much less that a consent order that first took effect in 1974 should be continued into the indefinite future. The City does not look to what has happened in the past as a justification for its present and

future promotional policies. Rather, it relies on the proposition that diversity within the police department at the rank of sergeant is a necessary goal which standing alone justifies the consideration of race as a factor for promotion.

Memorandum in Response to Plaintiffs' Motion for Partial Summary Judgment at 8–9.

No evidentiary hearing is required to support the conclusion that remedial action is warranted since the City admits that it has no evidence that remedial action is required. The City simply concludes that diversity within the police department at the rank of sergeant is a necessary goal which standing alone justifies the consideration of race as a factor. Further, the City argues that it has a compelling interest in achieving and maintaining a racially integrated Police Department at its various rank levels in order to be an effective law enforcement organization. The City further argues that "... adequate representation of minorities cannot be achieved without some consideration of race in the promotional process ..." City's Memorandum in Response to Plaintiffs' Motion for Partial Summary Judgment at 7. Thus, the City proposes that it continue to have a quota system *ad infinitum* for promoting non-whites in the absence of judicial, legislative or administrative findings of constitutional or statutory violations.

This argument typifies the very reasoning which Justice Powell in *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) found to be forbidden by the Constitution. There, Justice Powell wrote:

If petitioner's purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid. Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids. 438 U.S. at 307, 98 S.Ct. at 2757 (citations omitted).

The City's argument that it has a compelling interest in having a racially diverse police department is a vacuous attempt to justify its political judgment that a certain percentage of non-whites be promoted to the rank of sergeant. There is no evidence to support the City's conclusory statement that it has a "compelling interest" in having a racially diverse police department. The City has offered no factual evidence of what this "compelling interest" is. The reports the City has offered are not evidence, but are opinions and they do not provide a factual basis for denying Plaintiffs' Motion.

In the case before the Court there is no evidence of any Constitutional or statutory violations and therefore no governmental interest in preferring one group over another. Without such findings of constitutional or statutory violations, it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another. Thus, the government has no compelling justification for inflicting such harm. *Bakke*, 438 U.S. at 308, 309, 98 S.Ct. at 2757, 2758.

The Court concludes this discussion with the language of Justice Powell in *Bakke* which this Court feels places in perspective the never ending battle of alleged discrimination in this country which had been waged for more than 100 years:

Petitioner urges us to adopt for the first time a more restrictive view of the Equal Protection Clause and hold that discrimination against members of the white "majority" cannot be suspect if its purpose can be characterized as "benign." The clock of our liberties, however, cannot be turned back to 1868. *Brown v. Board of Education, supra,* 347 U.S. [483] at 492, 74 S.Ct. [686] at 690 [98 L.Ed. 873] [ (1954) ]; accord, *Loving v. Virginia, supra,* 388 U.S., [1] at 9, 87 S.Ct. [1817] at 1822 [18 L.Ed.2d 1010] [ (1967) ]. It is far too late to argue that the guarantee of equal protection to all persons permits the recognition of special wards entitled to a degree of protection greater than that accorded others. "The Fourteenth Amendment is not directed solely against discrimination due

to a 'two-class theory'—that is, based upon differences between 'white' and Negro." *Hernandez* [*v. State of Texas*], 347 U.S. [475] at 478, 74 S.Ct. [667] at 670 [98 L.Ed. 866] [ (1954) ].

Once the artificial line of a "two-class theory" of the Fourteenth Amendment is put aside, the difficulties entailed in varying the level of judicial review according to a perceived "preferred" status of a particular racial or ethnic minority are intractable. The concepts of "majority" and "minority" necessarily reflect temporary arrangements and political judgments. As observed above, the white "majority" itself is composed of various minority groups, most of which can lay claim to a history of prior discrimination at the hands of the State and private individuals. Not all of these groups can receive preferential treatment and corresponding judicial tolerance of distinctions drawn in terms of race and nationality, for then the only "majority" left would be a new minority of white Anglo–Saxon Protestants. There is no principled basis for deciding which groups would merit "heightened judicial solicitude" and which would not. Courts would be asked to evaluate the extent of the prejudice and consequent harm suffered by various minority groups. Those whose societal injury is thought to exceed some arbitrary level of tolerability then would be entitled to preferential classifications at the expense of individuals belonging to other groups. Those classifications would be free from exacting judicial scrutiny. As these preferences began to have their desired effect, and the consequences of past discrimination were undone, new judicial rankings would be necessary. The kind of variable sociological and political analysis necessary to produce such rankings simply does not lie within the judicial competence—even if they otherwise were politically feasible and socially desirable. *Bakke*, 438 U.S. at 294–297, 98 S.Ct. at 2750–2752.

The necessary evidence in the City and the Intervenor Defendant's resistance to the Plaintiffs' Motion for Summary Judgment is simply not present.

On the contrary, the evidence on the Plaintiffs' side is persuasive. That evidence is in summary that the black officers ranked Nos. 29, 62, and 74 were promoted because they were black, and would probably not been promoted had they not been black. This resulted in discrimination against the white officers who were not considered for promotion even though they ranked higher than the three black officers who were considered and promoted. Summary Judgment for the Plaintiffs is therefore appropriate.

## INJUNCTIVE RELIEF

On pages 15 through 20 of its Memorandum filed November 12, 1991, responding to Plaintiffs' Motion for Summary Judgment, the City argues:

1. The Court should not order the City to refrain from deviating from promoting in rank order under the present policy.

2. Any decision of the Court addressing the nature of Injunctive Relief should leave the City sufficient latitude to structure a new policy to accommodate affirmative action goals.

The Court will consider any plan proposed by the City which does not involve the use of race as a criteria for employment decisions.

The Court will grant the Plaintiffs' Motion for Partial Summary Judgment and Injunctive Relief.