10 F.3d 207
 63 Fair Empl.Prac.Cas. (BNA) 374,
63 Empl. Prac. Dec. P 42,658, 62 USLW 2288
 Ronald M. HAYES; Randy L. Hagler; Darrell A. Price; David
H. Holland; Robert A. Holl; Oswald D.
Holshouser; Raymond T. Carlton; S.
Vance Elstrom; Mark E.
Corwin, Plaintiffs-Appellees,
v.
NORTH STATE LAW ENFORCEMENT OFFICERS ASSOCIATION, Defendant-Appellant,
City of Charlotte, NC, Defendant-Appellee.
Ronald M. HAYES; Randy L. Hagler; Darrell A. Price; David
H. Holland; Robert A. Holl; Oswald D.
Holshouser; Raymond T. Carlton; S.
Vance Elstrom; Mark E.
Corwin, Plaintiffs-Appellees,
v.
CITY OF CHARLOTTE, NC, Defendant-Appellant,
North State Law Enforcement Officers Association, Defendant-Appellee.
 Nos. 92-2299, 92-2300.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 5, 1993.
Decided Oct. 27, 1993.
 
 Jim D. Cooley, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, argued (F. Lane Williamson, on brief), for appellant City of Charlotte.
 Geraldine Sumter, Ferguson, Stein, Watt, Wallas, Adkins & Gresham, P.A., Charlotte, NC, argued (James E. Ferguson, II, on brief), for appellant North State Law Enforcement Officers Ass'n.
 Louis L. Lesesne, Jr., Lesesne & Connette, Charlotte, NC, for appellees.
 Before ERVIN, Chief Judge, and NIEMEYER and WILLIAMS, Circuit Judges.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 In this appeal, the City of Charlotte contends that its interest in effective law enforcement justifies the use of a race-based promotion policy to achieve diversity within its police department. Plaintiffs, a group of non-minority officers who allege they were not promoted because of their race, challenge the City's explicit use of racial preference in promotions to the rank of sergeant. The district court granted partial summary judgment for Plaintiffs after concluding that the police department's promotion practices violated the Equal Protection Clause of the Fourteenth Amendment.[1] Hayes v. City of Charlotte, 802 F.Supp. 1361, 1377 (W.D.N.C.1992). The district court also enjoined the City from using "a racial based criterion for its employment decisions." (J.A. at 169.)
 
 
 2
 We affirm the district court's grant of partial summary judgment to the Plaintiffs because we conclude that the City has not provided sufficient evidence to survive summary judgment on its claim that racial diversity is essential to effective law enforcement and constitutes a compelling state interest. Moreover, the City has utterly failed to establish that the means it has chosen, an explicit racial preference, was narrowly tailored to accomplish its asserted goal. However, we vacate the injunction issued by the district court as overbroad, and remand for entry of more precise injunctive relief.
 
 I.
 
 3
 In any case involving allegations of "reverse discrimination," the historical context of the allegations is of paramount significance. Since 1974, the promotion of patrol officers to the rank of sergeant in the City of Charlotte has been controlled by a consent order entered during litigation between the City and North State Law Enforcement Officers, an organization of African-American police officers who alleged race discrimination in the Charlotte police department. Both of these parties are defendants in the instant case. In the consent order, the City did not acknowledge any racial discrimination in the hiring or promotion of African-American officers and has never acknowledged any racial discrimination in the promotion process for sergeants.
 
 
 4
 The 1974 consent order provided specific goals for the promotion of African-American officers. In particular, for promotions to the rank of sergeant, Paragraph 5 of the consent order provided that:
 
 
 5
 Effective immediately at least six (6) of the next fifteen (15) promotions to the rank of Sergeant shall consist of qualified black Patrolmen. In the event that the next fifteen (15) promotions are not made simultaneously, the promotion of qualified black officers to meet this goal shall be made at the rate of one (1) qualified black officer for every two (2) qualified white officers. Thereafter, the percentage of qualified black officers promoted to the rank of Sergeant during each successive six-month period shall conform as nearly as possible to the percentage that black Patrolmen comprise of all Patrolmen employed by the Police Department at the commencement of each such six-month period, until the percentage of black Sergeants comprises at least twenty percent (20%) of the total number of Sergeants employed by the Police Department.
 
 
 6
 (J.A. at 19.) The consent order also required the police department to file yearly reports with the district court indicating its progress toward these goals. According to these reports, the City reached the 20% goal in 1987.[2] The City has conceded that they have met the goal set forth in the consent order.
 
 
 7
 The City currently promotes officers to the rank of sergeant pursuant to an internal policy, General Order No. 18, which became effective in 1987. General Order No. 18 sets out a three-part process for determining which officers will be promoted. First, the officer must earn a passing score on a written examination. The officer's test score is scaled so that he can receive a maximum of 33 1/3 points for the written examination phase of the process. In 1990, the City received approval from the district court to use this written examination as part of the promotion process, "unless and until the Plaintiffs [North State Law Enforcement Officers Association] have shown that the use of the Promotion Examination and its results constitute unlawful racial discrimination." (J.A. at 31.) To date, no such challenge has been made.
 
 
 8
 Police officers who earn a passing score on the written examination then continue to the second and third phases of the promotion process. In the second phase, the officer's first and second level supervisors assess his potential for promotion. Using a "Promotional Potential Rating Form," the supervisors rate the officer in fifteen categories, on a range from one to five. These points are then scaled so that the officer may receive a maximum of 33 1/3 points for the evaluation phase. Finally, in the third phase the officer participates in an oral interview, lasting approximately thirty minutes, before a board that includes civilian and minority representatives. During the interview, the officer is questioned regarding problems relating to the operation of the department and presented with situational questions derived from case studies. The board members then rate the officer's responses. The maximum score for this phase is also 33 1/3 points.
 
 
 9
 The combined scores from all three phases are used to establish a promotion roster ranked in order of the officers' overall scores. According to General Order No. 18, this promotion roster "will determine the order of consideration for candidates, but not necessarily the order of promotions." (J.A. at 123.) General Order No. 18 grants the Chief of Police authority to promote any eligible applicant and allows him to consider the applicant's physical fitness and any other "relevant factor" in making his decision. General Order No. 18 does not define what "relevant factors" the Chief may consider.
 
 
 10
 In February 1991, the City of Charlotte promoted twenty-one officers to the position of sergeant from a promotion roster of seventy-four applicants. Of the twenty-one officers promoted, seventeen were white, and four were African-American. Chief D.R. Stone made the promotions after consultation with other members of the department. The promotions were generally made in rank order, with the only exceptions being consideration of disciplinary records,[3] the personal request of one officer (No. 16) that he not be promoted, and race.
 
 
 11
 Of the first twenty officers on the promotion roster, eighteen were promoted, including one African-American officer ranked No. 11. Two white officers ranked No. 8 and No. 21 were not promoted because of their disciplinary records. The remaining three officers promoted were African-American officers ranked No. 29, No. 62, and No. 74. Plaintiffs, two of whom were ranked above officer No. 29 and the rest who were ranked above officers No. 62 and No. 74, allege that these promotions violate the Equal Protection Clause.
 
 II.
 
 12
 The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, Sec. 1. In reviewing the constitutionality of state actions with regard to the standard embodied in the Fourteenth Amendment, the Supreme Court has "consistently repudiated 'distinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality,' " and has held that "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986) (plurality opinion) (quoting Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (quoting Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943), and Regents of the University of California v. Bakke, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (Powell, J., plurality opinion))). The same "exacting judicial examination" is applicable to any classification on the basis of race, regardless of the type, purpose, or alleged victim of the racial distinction. "[T]he level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination." Wygant, 476 U.S. at 273, 106 S.Ct. at 1846 (plurality opinion).
 
 
 13
 The City of Charlotte concedes that at least three of the four African-American officers who were promoted in February 1991 likely would not have been promoted except for their race. Indeed, the City's actions indicate that the African-American officers ranked No. 29, No. 62, and No. 74 were promoted pursuant to a straightforward racial classification. The issue in this case, therefore, is not whether the City employs an explicit racial preference in promoting its police officers, but whether the racial preference employed is constitutionally permissible.
 
 
 14
 Classifications based on race violate the Equal Protection Clause unless they can survive review under a standard of strict scrutiny. City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) (plurality opinion); id. at 519, 109 S.Ct. at 735 (Kennedy, J., concurring); id. at 551, 109 S.Ct. at 751 (Marshall, J., dissenting) ("Today, for the first time, a majority of this Court has adopted strict scrutiny as its standard of Equal Protection Clause review of race-conscious remedial measures."). We have learned through painful experience the danger of allowing agents of the state to make distinctions between individuals on the basis of their race. As we stated recently, the reason for this stringent standard of judicial review is plain:
 
 
 15
 Of all the criteria by which men and women can be judged, the most pernicious is that of race.... While the inequities and indignities visited by past discrimination are undeniable, the use of race as a reparational device risks perpetuating the very race-consciousness such a remedy purports to overcome.
 
 
 16
 Maryland Troopers Ass'n, Inc. v. Evans, 993 F.2d 1072, 1076 (4th Cir.1993). Justice O'Connor described a court's role in reviewing classifications based on race as follows:
 
 
 17
 Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.
 
 
 18
 Croson, 488 U.S. at 493, 109 S.Ct. at 721 (plurality opinion).
 
 
 19
 There are two aspects to this review. First, the use of a racial classification must be justified by a compelling governmental interest. Wygant, 476 U.S. at 274, 106 S.Ct. at 1847 (plurality opinion). Second, the means the governmental entity uses to effectuate its interest must be "narrowly tailored to the achievement of that goal." Id. (quoting Fullilove v. Klutznick, 448 U.S. 448, 491, 100 S.Ct. 2758, 2781, 65 L.Ed.2d 902 (1980) (plurality opinion)). Applying this standard in the context of this case, the City must demonstrate, first, that a compelling governmental purpose justified the use of a racial preference and, second, that the means chosen, namely the selection of officers for promotion solely because of their race, was narrowly tailored to accomplish that purpose.
 
 A. Compelling Governmental Interest
 
 20
 Chief Stone testified that he gave preference to African-American officers pursuant to the consent order, which required the goal of 20% African-American sergeants, and because of his "belief that the Charlotte Police Department should be integrated and be reflective of the community at large, both in terms of police officers as well as the supervisors," in order to increase the effectiveness of the police force through enhanced cooperation and support from the citizens of Charlotte.[4] (J.A. at 61.) The City contends that it has a compelling state interest in maintaining effective law enforcement. According to the City, effective law enforcement can only be accomplished in Charlotte with a racially diverse police force, and the only way to achieve racial diversity is to promote officers on the basis of their race.
 
 
 21
 The Plaintiffs argue that the only compelling state interest which justifies the use of racial classifications is the remedying of past discrimination and even then only in light of strong evidence of discrimination. See Croson, 488 U.S. at 493, 109 S.Ct. at 721 (plurality opinion); Maryland Troopers, 993 F.2d at 1076. The City does not offer past discrimination as a justification for its policies. While it acknowledges that remedying the effects of past discrimination is the justification for most voluntary and court-ordered affirmative action programs which survive judicial review, the City contends that neither the Supreme Court nor this circuit has foreclosed other justifications.[5]
 
 
 22
 Without deciding whether achieving a greater racial diversity within the police department is a compelling state interest that might justify awarding promotions on the basis of race, when not directed at past discrimination, we agree with the district court that the evidence offered by the City to establish the benefits of such diversity is not sufficient to create the genuine issue of material fact necessary to survive summary judgment.
 
 
 23
 In Croson, the City of Richmond contended that it had a compelling state interest in remedying the present effects of past discrimination in the construction industry. See 488 U.S. at 498, 109 S.Ct. at 723. The Supreme Court rejected the City of Richmond's contention because it lacked a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " Id. at 500, 109 S.Ct. at 725 (quoting Wygant, 476 U.S. at 277, 106 S.Ct. at 1849 (plurality opinion)); Maryland Troopers, 993 F.2d at 1076. Even if a compelling state interest could be based on other than remedying past discrimination, a "strong basis in evidence" surely would be required for the proffered necessity of diversity among the police sergeants. Therefore we turn to the district court's holding in this case that the City offered no factual evidence to support its position that a racially diverse police department was required for effective law enforcement. Hayes, 802 F.Supp. at 1376.
 
 
 24
 The only evidence which the City offered to support its contention that effective law enforcement requires racial diversity was the opinion of the Chief of Police, Chief Stone, and three reports prepared in response to the urban riots in Detroit in the 1960's. There are several reasons why we, like the district court, are troubled by the type of evidence which the City offered to justify its actions.
 
 
 25
 First, there is Chief Stone's opinion. According to Chief Stone, the police department must be racially integrated at all rank levels in order to be an effective law enforcement organization. (J.A. at 121.) Chief Stone based this opinion on his own personal experience and his agreement with the recommendations of the reports referenced above. He stated that in order to gain the confidence and acceptance of the community, the police force should be representative of the community as a whole at all levels, including supervisory positions.
 
 
 26
 We have no doubt that Chief Stone's opinion is based on his significant experience in the field of law enforcement and his genuine desire for the police department of the City of Charlotte to perform up to its highest potential. Nevertheless, the dangers of relying on subjective evidence to support utilization of racial classifications in employment promotion decisions are apparent. In this case, Chief Stone essentially offers the "confidence and acceptance of the community" as a justification for denying promotions to white police officers exclusively because of their race. (J.A. at 122.) If this is found to be enough evidence to justify the need for race-conscious policies, we fear others could use this same rationale for a much less benign purpose. Such a result would promote racial polarization and the stereotypical view that only members of the same race can police themselves.
 
 
 27
 The Supreme Court expressed a similar concern in Wygant with regard to the school board's contention that the state's interest in remedying societal discrimination and providing role models for African-American students justified its layoff of white teachers based on their race. Justice Powell noted that because the role model theory did not bear any relationship to the harm caused by prior discriminatory practices, "it actually could be used to escape the obligation to remedy such practices" by justifying a small percentage of African-American teachers by reference to the number of African-American students. Wygant, 476 U.S. at 276, 106 S.Ct. at 1848 (plurality opinion). Similarly, an official in another city could justify a smaller percentage of African-American officers based on the very same "community acceptance and confidence" rationale, without regard for the individual abilities of each officer.
 
 
 28
 When questioned about this concern at oral argument, the City acknowledged that Chief Stone's opinion alone was insufficient, and that the City had to support its contention with "objective evidence" as well. The only objective evidence the City has offered is three reports prepared in response to the urban riots in the City of Detroit in the 1960s. The Sixth Circuit used these same reports in Detroit Police Officers' Ass'n v. Young, 608 F.2d 671, 695, 696 (6th Cir.1979), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), in support of its conclusion that the operational needs of the police department represented a substantial interest of the City of Detroit. These reports emphasized the visibility of the citizens' relationship with their government through the police department, stressed the importance of public cooperation and support, and recommended the recruitment of additional minority police officers as a means of improving community support and increasing the effectiveness of law enforcement.
 
 
 29
 As the Plaintiffs point out and the district court found, while these reports may express legitimate opinions about the need for diversity in effective law enforcement, in themselves they contain no factual support for the City's position that diversity at all ranks, or specifically at the rank of sergeant, was essential to effective law enforcement in Charlotte, North Carolina, in February 1991, when the City made these promotions. We agree with the district court that more evidence was required to survive summary judgment. Although the City was not required to submit studies conducted in the City of Charlotte in 1991 which reach these same conclusions, it was obligated to offer strong objective evidence why the situation evaluated in these studies is analogous to the present circumstances in Charlotte in 1991.[6] Despite the weaknesses in its evidence, the City points out that all inferences are to be drawn in its favor at the summary judgment stage, that its evidence is uncontroverted by Plaintiffs, and that these reports, coupled with Chief Stone's testimony, were sufficient to raise a genuine issue of material fact regarding whether racial diversity at the rank of sergeant is essential to effective law enforcement. We disagree. We have already mentioned the lack of a factual basis for the opinion evidence offered by the City. Even if there were such a factual basis, "[n]either the factual assumptions underlying an expert's opinion nor the expert's inferences from the facts assumed are automatically established by the absence of directly countering expert opinion." Erie Ins. Exch. v. Stark, 962 F.2d 349, 353 (4th Cir.1992).
 
 
 30
 The City further contends that we should reverse and remand for an evidentiary hearing in order to allow it to further develop the factual basis for its claims. Again, we disagree. The City was required at the summary judgment stage to go beyond its pleadings and come forward with specific facts in support of its claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The City could not simply "rest upon the mere allegations or denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The City never asked the district court for additional discovery to respond to Plaintiffs' motion for summary judgment, or for additional time to "develop the factual record" in support of its alleged compelling state interest. In these circumstances, it would be inappropriate to allow the City to try again in its effort to support its position. See Sweats Fashions Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1567 (Fed.Cir.1987) ("A party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit."); General Office Products Corp. v. A.M. Capen's Sons, Inc., 780 F.2d 1077, 1078 (1st Cir.1986) ("The burden is on both parties to file necessary materials with the court to support their claims for and against summary judgment."). Further, there is no evidence that the use of a racial preference to promote sergeants was narrowly tailored to the goal of diversity in an effective law enforcement operation.
 
 B. Narrowly Tailored
 
 31
 Even were the City able to muster additional evidence, we are still left with the inexorable conclusion that the City has utterly failed to demonstrate that the means it employed, the promotion of officers based on a numerical racial goal, was narrowly tailored to accomplish its asserted purpose of achieving effective law enforcement through diversity. Classifications based on race carry a very real danger of stigmatic harm; they threaten to stereotype individuals because of their race and incite racial hostility. Shaw v. Reno, --- U.S. ----, ----, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993); Croson, 488 U.S. at 493, 109 S.Ct. at 721 (plurality opinion). As Justice Powell has pointed out:
 
 
 32
 All state-imposed classifications that rearrange burdens and benefits on the basis of race are likely to be viewed with deep resentment by the individuals burdened.... One should not lightly dismiss the inherent unfairness of, and the perception of mistreatment that accompanies, a system of allocating benefits and privileges on the basis of skin color and ethnic origin.
 
 
 33
 Bakke, 438 U.S. at 294 n. 34, 98 S.Ct. at 2750 n. 34. We also must remain cognizant that preferences based on race "may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth."[7] Id. at 298, 98 S.Ct. at 2752.
 
 
 34
 For these reasons, any race-conscious state policy that might be justified by a compelling state purpose must also be narrowly tailored to accomplish the asserted purpose. In reviewing whether state policies are "narrowly tailored" we consider factors such as: (1) the efficacy of alternative race-neutral policies; (2) the planned duration of the policy; (3) the relationship between the numerical goal and the percentage of minority group members in the relevant population or work force (4) the flexibility of the policy, including the provision of waivers if the goal cannot be met; and (5) the burden of the policy on innocent third parties. United States v. Paradise, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (plurality opinion); id. at 187, 107 S.Ct. at 1074 (Powell, J., concurring).[8]
 
 
 35
 First, the City presented absolutely no evidence that it considered any less restrictive alternatives to accomplish its goal of achieving racial diversity. The City simply relied on the bald assertion that "[a]dequate representation of minorities cannot be achieved without some consideration of race in the promotional process." (Brief of Appellant City of Charlotte at 8.) In our view, the City went much further than "some consideration of race" in this case. Indeed, the City effectively concedes that the only reason three officers were or were not promoted was because of their race. As in Croson, the City did not appear to have considered the use of any race-neutral means, rather than a race-based numerical goal, to accomplish its goal of diversity. 488 U.S. at 507, 109 S.Ct. at 729. Rather than treat all candidates individually and assess their specific qualifications, the City of Charlotte has chosen to make the color of the applicant's skin the sole relevant consideration in choosing among qualified candidates. The administrative convenience of such an approach is far outweighed by the burden borne not only by the officers rejected for promotion solely because of their race but by the African-American officers who have been stigmatized by these actions.
 
 
 36
 The use of racial preferences must be limited so that they do not outlast their need; "they may not take on a life of their own." Maryland Troopers, 993 F.2d at 1076; see also Paradise, 480 U.S. at 178-79, 107 S.Ct. at 1070 (plurality opinion). As the Supreme Court held in Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 639-40, 107 S.Ct. 1442, 1455-56, 94 L.Ed.2d 615 (1987), even when race can be taken into account to attain a balanced work force, racial classifications may not be employed to maintain a balanced work force. The City has offered no evidence regarding the duration of its use of racial preferences. Furthermore, it has offered no evidence indicating that the City regularly reevaluates its use of racial preferences to insure that such preferences continue to be justified by some compelling state interest. Indeed, the City's efforts suffer from the same fatal defect recognized with regard to the role model theory in Wygant: they have "no logical stopping point." 476 U.S. at 275, 106 S.Ct. at 1847 (plurality opinion).
 
 
 37
 The City contends that its promotion policy was narrowly tailored because: (1) no unqualified candidate was considered for promotion;[9] (2) Plaintiffs were only denied an employment opportunity, not deprived of their existing jobs as in Wygant, 476 U.S. at 282-283, 106 S.Ct. at 1851 ("[d]enial of a future employment opportunity is not as intrusive as loss of an existing job") (plurality opinion); and (3) the 20% goal was reasonable in light of the composition of African-American patrol officers on the police force and the racial composition of the City of Charlotte.[10]
 
 
 38
 While these facts may be true, they do not support the conclusion that the City's actions were narrowly tailored. The essence of the "narrowly tailored" inquiry is the notion that explicit racial preferences, if available at all, must be only a "last resort" option. Without evidence that the City considered race-neutral alternatives to achieve diversity, or that the use of a non-discriminatory policy would not achieve its goal, we simply cannot hold that the City's promotion policy was narrowly tailored.
 
 
 39
 Because we conclude that the City's explicit use of racial classifications in the 1991 promotions was not justified by a compelling state interest and was not narrowly tailored to achieve its asserted purpose, we affirm the district court's grant of summary judgment to Plaintiffs.
 
 III.
 
 40
 The City also contends that the injunction issued by the district court, enjoining all use of racially based criteria by the City of Charlotte in its employment decisions, was broader than necessary to give Plaintiffs complete relief. We agree. An injunction "should be tailored to restrain no more than what is reasonably required to accomplish its ends." Consolidation Coal Co. v. Disabled Miners, 442 F.2d 1261, 1267 (4th Cir.), cert. denied, 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971). Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation.
 
 
 41
 The only policy challenged in this case was the police department's promotion policy with regard to sergeants. There has been no controversy with regard to the entire City's employment decisions. Neither has there been any need to address the continued validity of the 1974 consent order with regard to any other employment decisions within the police department. The injunction clearly went further than was required to award full relief to the Plaintiffs in this case. Therefore, we vacate the injunction issued in this case and remand for the issuance of an injunction properly tailored to the wrong found in this case: the use of racial preference as the criterion for promotions to the rank of sergeant.
 
 IV.
 
 42
 For the foregoing reasons, we affirm the district court's grant of partial summary judgment in favor of Plaintiffs, vacate the injunction issued against the City, and remand for entry of a properly limited injunction, and for resolution of the issues stayed in order to allow this appeal.
 
 
 43
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 The district court reserved for further evidentiary hearings the issue of damages and attorneys' fees to which Plaintiffs may be entitled. The grant of only partial summary judgment makes appeal interlocutory. Nevertheless, jurisdiction is proper under 28 U.S.C. Sec. 1292(a)(1) (1988) because of the grant of an injunction against the City
 
 
 [2]
 The City's 1990 report indicates that at the end of 1987 22% of the officers holding the rank of sergeant were African-American, and for the successive years the approximate percentage of African-American sergeants was 20% at the end of 1988, 20% at the end of 1989, and 22% at the end of 1990. (J.A. at 111.)
 
 
 [3]
 There are four classifications of disciplinary violations: A, B, C, and D, with A being the most serious. According to the testimony of Chief Stone, it is the policy of the department not to promote officers who have received an "A" classification disciplinary violation resulting in active suspension within the past five years
 
 
 [4]
 Although the City initially raised compliance with the 1974 consent order as a defense, it does not now rely on such compliance as a justification for its promotion policy. Nor does the City contend that the consent order should be continued into the indefinite future. Therefore, for purposes of our review, the City's actions are viewed as voluntary affirmative action efforts. The City also does not rely on a showing that it was undertaking efforts to remedy the present effects of prior discrimination, which in certain circumstances has been recognized as a sufficient justification for the use of affirmative action measures. See Wygant, 476 U.S. at 274, 106 S.Ct. at 1847 (plurality opinion). Lastly, the City does not assert that the past under-representation of minorities within the department justifies its consideration of race in the 1991 promotions of officers to sergeant. While at the time of the 1974 litigation no African-American officer held the rank of sergeant, it is undisputed that at the time of trial over 20% of the sergeants in the department are African-American
 
 
 [5]
 The same "operational needs for diversity" justification was argued before the Supreme Court in United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), a case challenging a policy requiring that 50% of promotions from state trooper to corporal be allocated to African-Americans. The Supreme Court did not address the contention because the judicial determination of prior discriminatory policies and conduct satisfied the first prong of the strict scrutiny test. Id. at 167 n. 18, 107 S.Ct. at 1064 n. 18 (plurality opinion) ("We need not decide if either the generalized governmental interest in effective law enforcement or the more particularized need to overcome any impediments to law enforcement created by perceptions arising from the egregious discriminatory conduct of the Department is compelling.")
 In Talbert v. City of Richmond, 648 F.2d 925, 928 (4th Cir.1981), cert. denied, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982), the City of Richmond did not rely on prior discrimination to justify its conduct but asserted that it considered race in the promotion process in order to advance the "operational needs of the police department by achieving diversity among the officers ranked as major." We upheld the constitutionality of the City's actions on the ground that the attainment of racial diversity was "a legitimate interest of the city" which justified the City's "individualized consideration of Miller's race together with all other relevant factors." Id. at 931-32 (emphasis added). We did not determine that the interest was sufficiently "compelling" to justify racial classifications under the strict scrutiny standard, the standard that the City of Charlotte must satisfy here.
 
 
 [6]
 For example, the historical context of the affirmative action program at issue in the 1979 Detroit decision included what the court found to be a gross record of prior discrimination, statistical disparities, and documented racial unrest and riots. We also note that this very same affirmative action program was recently held to be no longer narrowly tailored or required to serve a compelling state interest under the changed circumstances of two decades. Detroit Police Officers' Ass'n v. Young, 989 F.2d 225, 228 (6th Cir.1993)
 
 
 [7]
 Although there is no evidence in this record of any harmful effects from the City's actions, such as negative stereotypes or racial hostility, in the first district court opinion in Detroit Police Officers, 446 F.Supp. 979, 1002 (E.D.Mich.1978), such evidence was presented and led the district court to conclude:
 the inclusion of race as a promotional criterion damages departmental morale and the quality of work of all officers. The record evidence demonstrates ... that a police officer's effectiveness, as a professional law enforcement officer both within the department and the community in which he serves, is dependent upon his education, skill, training, attitude and sense of professionalism. The unalterable pigment of his skin has no bearing on these facts and neither enhances nor depreciates his professional enforcement effectiveness.
 
 
 [8]
 We note, however, that these factors are particularly difficult to assess where, as here, the policies are not tied to identified past discrimination. Croson, 488 U.S. at 507, 109 S.Ct. at 729
 
 
 [9]
 We note that the testimony quoted at length in the district court's opinion tends to belie this contention, particularly with regard to Officer No. 11 who was promoted despite a disciplinary record which included grade A violations for conduct that included egregious physical abuse of prisoners in his custody. See Hayes, 802 F.Supp. at 1366-67
 
 
 [10]
 According to the City, 1990 census data indicate that the population of the City of Charlotte is approximately 31.8% African-American